[No. F007576. Fifth Dist. Feb. 10, 1988.]

In re BRITTANY H., a Minor.
DAVID J. et al., Petitioners and Respondents, v.
EVETTE H., Objector and Appellant.

534

■■■■■■■■■■

■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

■■■■■■■■■■■■■■■■■■■■

COUNSEL

Gregory M. Chappel, under appointment by the Court of Appeal, for Objector and Appellant.

Fletcher & Fogderude and Norman L. Fletcher for Petitioners and Respondents.

Jesse S. Kaplan, under appointment by the Court of Appeal, for Minor.

OPINION

BEST, J.—

### THE CASE

On June 18, 1985, David J. and Deborah (Debbie) J. filed a petition (action No. 331205-5) for the independent adoption of Brittany H. The petition alleged that Evette H. (Evette) and Kevin O. were the natural parents of Brittany and would consent to the adoption. Following an attempt by Evette to remove Brittany from their custody, the J.'s obtained an order restraining the removal of the child from their home. On October 25, 1985, following a hearing, the Fresno County Superior Court granted temporary custody of Brittany to the J.'s.

On November 18, 1985, the J.'s filed a petition (action No. 338929-3) requesting that they be appointed the legal guardians of Brittany.

On May 1, 1986, the J.'s filed a petition (action No. 347036-6) pursuant to Civil Code section 232, subdivision (a)(1), to have Brittany declared free from the custody and control of her natural parents. It was stipulated by counsel for the J.'s, Evette, and the Department of Social Services that hearing on this petition could proceed on that same date, May 1, 1986,

without objection. The clerk's minutes reflect the three actions were ordered consolidated. Trial of the consolidated actions commenced on that date, May 1, 1986, and concluded on May 16, 1986, with the court orally stating it was granting the petition terminating the parental rights of the natural mother, Evette. Further hearing on the adoption petition was continued to June 13, 1986, the date Brittany's natural father, Kevin O., had been cited to appear in connection with the Civil Code section 232 proceeding.

On June 13, 1986, no appearance was made by Kevin O. and, after hearing additional testimony, the court signed a judgment freeing Brittany from the custody and control of Evette and Kevin O. and appointing the J.'s guardians of the child. On the same date, June 13, 1986, the court signed a decree of adoption decreeing Brittany to be the adopted child of the J.'s.

## STATEMENT OF FACTS

During August or September of 1984, Evette determined by herself that she was pregnant. At that time she was a senior at Roosevelt High School and not quite 18 years old. She was enrolled in a class taught by Delores Robinson, to whom she disclosed the fact that she was pregnant and that she wished to leave the school for a program of home instruction.

Evette told Ms. Robinson that she herself was an adopted child and that she could make someone happy by giving her baby up for adoption. Evette also explained, "I have no maternal instincts. I don't feel anything. . . . I don't want to keep this baby. I have college yet. I have my career planned. This baby isn't in my career plans." She also told Ms. Robinson that she had not done much babysitting and that she did not feel that she had a rapport with little children. Ms. Robinson suggested that Evette contact Infant of Prague and other organizations which could provide counseling. She also mentioned that a natural mother can select the adoptive parents of her child and that Mrs. J., the school psychologist, might be interested in adopting a baby.

Vonda J. Epperson is the mother of a friend of Evette's and has known her for 10 or 11 years. She saw Evette several times between January 1985 and May 1985 when the baby was born. Evette told her that keeping the baby was not an option for her because she wanted to go to college and wanted to work in deaf education and " 'a baby would be in the way all the time,' . . . [and] she wanted to give the baby up because she says, 'I don't even like babies.' "

Debbie was a school psychologist for the Fresno Unified School District and had been married to David J. for 10 years. She first met Evette on

January 9, 1985. They talked about her pregnancy, and Mrs. J. asked her to consider them as adoptive parents. The J.'s met with Evette and her parents for three hours on February 15. They discussed the positive state of the J.'s marriage. Debbie told Evette that they were involved in church activities and that she would be a working mother. On March 1, 1985, Evette called them and told them that she had selected them as adoptive parents.

Mrs. J. offered to pay for any medical bills not covered by welfare as the natural father was not helping out. Evette signed a consent to adoption form on March 25, 1985. Debbie and David went to Lamaze child-birthing classes with Evette in April.

Vivian Schroeder had known Evette for three and one-half to four years and saw her in April of 1985 before the birth. Evette was happy that the baby was going to the J.'s. She thought they were an appropriate couple for her child because they were a "good Christian family." After the birth she still felt that her daughter was in a good home.

Barbara Mitchell was 18 years old at the time of trial. She had grown up with Evette. They had been "best friends" over a 15-year period. Evette had told her that she did not feel that she could take care of the baby in the manner in which she should be taken care of. She was excited that the J.'s were adopting the baby and that they went to Lamaze classes with her, went to dinner with her and spent time with her.

The J.'s selected the baby's name and met Evette at the hospital for the delivery. Evette and her family referred to the baby as "Dave and Debbie's baby." After she was born, the baby was handed to Debbie first, then to David and then to Evette. The next day Evette reaffirmed that she wanted the J.'s to adopt the baby, and on the day after the birth, they took the baby home from the hospital.

After the birth, Debbie felt that Evette was disgruntled because she was not getting as much attention as she had received when she had been pregnant. Debbie believed that Evette felt that, since the delivery, the baby had everything and that "nobody was looking at her any longer." Debbie also believed that Evette felt that the J.'s should pay her college tuition. At a lunch meeting occurring between March and May of 1985, Debbie had told her that they would set up a trust fund for Brittany's college education. Evette "asked what about for me [Evette], and I told her at that time we couldn't set a trust fund up for her or give her any money because we can't buy a baby. It was illegal."

A week after the birth, Evette visited the J.'s and told them that she was happy with the arrangement and did not want to see the baby again until

after the adoption was final. However, at one point Debbie told Ms. Robinson that Evette did not seem to be making any contact with them, and she wondered why she was so upset. On July 5, 1985, Evette called the J.'s again. She was unhappy because she was not getting enough pictures and because Debbie was working. She told Debbie, "If you don't quit working, I'll pull the baby out of your home and give it to someone else." Barbara McLaughlin, who had known the J.'s for 11 years, was at their home on that evening and spoke to Evette. Evette told her that she was going to take Brittany out of the J.'s home and put her in another adoptive home.

Evette told them not to call her home, not to communicate with her parents and that she would get in touch with them. The J.'s met Evette the next day at a restaurant for lunch. They offered her the baby bottle so she could feed Brittany, but she did not want to do so. Evette again told Debbie that if she did not quit working, she would take the baby and give it to someone else. She was adamant on this point even though Debbie had informed her that she had signed a contract for the next year with the school district. After discussing their options, they agreed that Evette would call them later with her decision. They did not hear from her again until October 17, 1985, when she showed up on their doorstep about 10 p.m. with the sheriff and demanded the return of the child.

Deputy Mike Robinson from the Fresno County Sheriff's Department was dispatched to meet a female at a 7-Eleven store in the area of Fowler and Bullard on the night of October 17, 1985, about 9:30 p.m. He met Evette there. She seemed angry, and she stated that she wanted to go pick up her baby. While still in the hospital, but after the delivery, Evette had spoken with a hospital social worker and an attorney who advised her that, with an independent adoption, she had six months to decide whether to keep the child or not. When she went out to the J.'s home on October 17, she believed that because the six months had not passed and she had not signed the final consent papers, she could pick up the baby "no questions asked."

Deputy Robinson stated that Evette was reluctant at first to tell him why she wanted to remove the baby. She told him that all she had to do was prove who she was and that she wanted to remove the baby. She told him that she did not have to explain why. She did eventually explain that she was concerned because communication had stopped and certain photographs had not been received. Evette intended to take Brittany "to a foster home and keep it until she chose one of three families that she felt that the baby would be suitable for." He was questioned further on this point as follows: "Q. But was it clearly stated by her that the only reason she was taking the baby out was to give it to somebody else?

"A. Yes, sir. I—I asked her after she stated that, I said, 'In other words, you don't—you don't—you don't want to take this baby with you now, you're not going to take it hom'? [*sic*] She says no, she was living in a dormitory at State, Cal State. All she wanted was just to take the baby from the [J.'s]. She wanted to take the baby and put it in another home, someone that didn't work, someone that would keep talking to her.

"Q. Did you—was there any discussion about what would happen if she wasn't happy with this new set of parents?

"A. Yes, she—I explained to her—or asked her, I said, 'If you're not happy with the—with the person you pick out, the parents, new parents, what would happen in two or three months from now, that—if you felt that the communications stopped, if they didn't supply you with what they [*sic*] wanted, if the baby wasn't raised your way, your morals, or whatever you're stating here tonight, what would you do?' 'I would move it again. I'd keep moving it until I found the right parents.' "

Upon arrival at the J.'s home, Deputy Robinson told the J.'s that Evette wanted to remove the baby. The front room was full of baby toys, swings, "baby bottle, baby paraphernalia, infant stuff." Once they were inside the home, Deputy Robinson told Evette that she owed Debbie and David an explanation. She told them: " 'I've been to Infant of Prague, and they've given me a list of a 150 names, and out of those names I've selected three families, and there's one family in particular that meet'—'will meet all my needs and demands.' And she said, 'It's an upper middle-class family where the wife doesn't work,' and she said, 'I've decided to place my baby with that family.' She said, 'You know I have high morals and standards.' And I [Debbie] said, 'Evette, you know, you never called us back, you never said anything to us, you've never communicated to us.' "

Immediately prior to this exchange, Evette had used the J.'s telephone to place a call. She dialed a number and said, " 'Judy, there's a problem. . . . I did what you told me to do, but they won't let me take my baby.' " "Judy" was apparently Judy Casson, a social worker for Infant of Prague who had seen Evette for counseling.

Deputy Robinson contacted his supervisor, Sergeant Risconi, who soon arrived at the house. They attempted to persuade Evette to wait until the next day. She told them, " 'No, I have school tomorrow, and I have things to do, and I want that child tonight.' " She then told them that she was not going to keep the baby herself and that she had two people waiting outside of Infant of Prague adoption agency and that she did not like the way the baby was being raised. She told them that these people were waiting to take

the baby and put her in a foster home and that she had already picked out her new set of parents.

David and Debbie contacted their attorney, and eventually Judge Gomes was contacted. Sergeant Risconi spoke to the judge. He informed everyone that the judge had granted a restraining order that prevented the removal of the baby from the home that night. The parties were to appear at 9 o'clock the next morning before Judge Nunez. That hearing was continued until October 25, at which time Judge Quaschnick granted temporary custody of the baby to the J.'s.

On October 29, 1985, the J.'s received an anonymous telephone call during which a girl said, " 'You better give my baby back or you'll be sorry.' " On November 6, Evette called at 8:30 p.m. and asked to come visit the baby. David told her that Brittany had been sleeping for an hour and to come the next day at 7:30 in the evening. She arrived the next day about 8:15 and stayed until 9. Evette did not see the baby again until April 1, 1986. On November 25, 1985, Evette called the J.'s and said she was coming to visit with two ladies. When Debbie asked who they were, Evette "said it was none of my [Debbie's] business, she could bring whoever she wanted to out to our house. She didn't have to explain to us who she was bringing." When Evette arrived with her two companions, she was served with documents regarding the guardianship proceeding and denied access on the advice of counsel.

On December 18, 1985, Debbie sent Evette a letter inviting her to come visit the baby during Christmas vacation provided that she made arrangements two days in advance. They did not hear from her in reply; Evette did not send the baby a Christmas gift.

In April 1986, a stipulation was entered into providing for specific visiting nights. Brittany does not sleep well on the nights Evette comes to visit and shows a marked preference for the J.'s during these visits. Paula Sebra, who has a professional and educational background in sociology and adoptions, is a neighbor of the J.'s and was present on several occasions when Evette visited the baby. On these occasions the child would cry uncontrollably when left alone with Evette and stop when Debbie came into the room to comfort her.

Dr. Janice Hatmaker, a psychologist, testified that removal of a one-year-old child from its psychological parents would produce both short-term and long-term effects. She testified as to the importance of "bonding" between the child and the parent, and testified that bonding would not have occurred between Brittany and Evette but would have occurred between Brittany and

the J.'s. She described the possible physical effects as follows: "I think that very often we see just a change in the immune system, we often see children that develop bowel syndrome such as diarrhea or constipation, sometimes they have very definite restlessness, they won't sleep, just a lot of physical illnesses, night terrors can develop, many kinds of physical symptoms crying, all kinds of physical symptoms can occur."

The long-term effects would include a loss of trust, which would exhibit itself throughout a person's life. If a child loses trust and dependability in its environment, the problems arising in adolescence would be "at least twice as great and maybe even more than that if the amount of trust is not broken."

David takes an active part in parenting the child. He spends approximately five hours each day with Brittany and has done so since she was brought home from the hospital. He feeds her, changes her diapers, plays with her and walks with her outside.

Brenda Chaney is an adoption case worker with the California Department of Social Services. She did the interview and home study on the J.'s. She visited them first on October 24, 1985, and found that the baby "was adjusting very well." She characterized the J.'s home as "a very stable home environment, loving, very supportive, very middle-class home environment; and just lots of love." She felt bad that Evette wanted to remove Brittany because the baby "was really doing well in their home." She felt it was not in the child's best interest to move it to another home.

However, because Evette had not signed the consent to adoption form, she could not recommend adoption. She was concerned that Evette had not thought through her plans and believed that she would possibly sign the consent form in the future. If the child were free for adoption by either consent or a Civil Code section 232 proceeding, she would recommend that the child be adopted by Debbie and David. She had not considered the best interests of the child in her determination, but only the fact that the child was not "free" for adoption at that time.

Ms. Chaney also testified that within a period of less than one year previous to this meeting, Evette had lived with her parents, her grandmother, her cousins and at the sorority house. She felt that a person who had this many residences within that short period of time was not a stable person. Furthermore, she stated, "It would be detrimental to move the child after two years in a home after the bonding. It would be very hard on the child as well as the adopting parents." Lastly, when she first contacted Evette, she felt that she was "just not sincere." On November 15, 1985, Ms. Chaney

told Debbie that they should have the baby and that " '[she did] not feel that Evette is sincere in that she really wants the child.' "

Claire Tipton, the adoption supervisor for the California Department of Social Services, testified that she felt "keenly that children have an advantage by being raised by birth parents." They had no choice but to recommend denial of the adoption because the child was not "free" for adoption. However, they still had "some real reservations" in terms of return to Evette. She believed that Brittany would experience problems if she were removed from the J.'s home but felt that there would be fewer problems "down the road" if the child was raised by her natural mother. In reference to abandonment, she stated that one of the factors in considering whether or not a child has been abandoned is the number of contacts a mother had with the child.

Stephanie Jordan, who is a teacher with a master's degree in counseling and is also Debbie's sister, was at the J.'s home one evening when Ms. Chaney was there. She testified that Ms. Chaney said that Brittany was a happy, well-adjusted baby and should stay with the J.'s. She said that Evette was not very stable and was not emotionally and financially capable of raising Brittany. Ms. Chaney also said that she had been getting pressure from her supervisors and that if she testified, she would "have to testify according to what the agency wants me to say, and this will not benefit you [Debbie and David]." At a previous hearing on April 18, Ms. Chaney had told Ms. Jordan that she was "very distressed" and "in a turmoil" and that she wanted the baby to stay with Debbie and David. She also said that if she told the truth at the trial, she would lose her job.

Judy Casson was the social worker at Infant of Prague who saw Evette for counseling. The fees for an adoption arranged by Infant of Prague range from $5,500 to $7,500. She saw Evette on October 17, 1985, the day on which she attempted to reclaim the baby. She testified that at that time Evette did not know conclusively whether she was going to attempt to pick up Brittany that night. At one time, Evette had told her that she felt badly because she had not looked at other families as potential adoptive parents. Ms. Casson felt that Evette was "in a position to parent the child," and it was her understanding that she had intended to reclaim the baby for herself on October 17.

Ms. Casson felt that Evette's criticism of the J.'s was unrealistic, and she tried to set up a meeting between the J.'s and Evette with herself sitting in. Evette would not participate. Evette told her that the J.'s had planned to set up a trust fund for her and the baby but they found out it was illegal so they were going to "wait to set up the trust fund until after the consent was

signed and the adoption finalized." Ms. Casson had kept detailed notes on her conversations with Evette. The court questioned her directly as to the content of these notes with respect to the October 17 meeting. The notes reflected that Evette stated that she did not want Brittany to remain with the J.'s. They did not reflect any decision on Evette's part to parent the child herself.

Evette testified that she was 19½ years old at time of trial and employed as a cashier at Mountain Mike's Pizza and Round Table Pizza earning minimum wage. She stated that on the night of October 17, she had planned to place Brittany in a foster home until she could finalize the arrangements to care for her herself. She also testified that she did not finalize her plans to keep the baby herself until she was leaving the J.'s home that night. During the first six months of her baby's life, she only spoke to the J.'s on three occasions. She saw the child twice during that time, once at the J.'s home and once at the restaurant meeting. In preparation for caring for Brittany, she had acquired baby toys, some clothes, a high chair, a crib and had saved $200.

Evette also stated that she had told Debbie she did not want an adoptive mother who worked to adopt her child, and that Debbie had said she would arrange to quit her job until the child was of school age. She found out before the birth that Debbie still planned to work but she "still let it go." She felt that she had acquired the maternal instincts which she had lacked earlier and could properly parent Brittany.

### DISCUSSION

I. *Whether the Natural Mother's Attempt to Remove the Baby on the Night of October 17, 1985, Precludes a Finding of Abandonment.*

Evette contends that her attempt to remove Brittany from the J.'s home on October 17, 1985, precludes a finding of abandonment which is a prerequisite to a judicial declaration that the child is free of her parental custody and control. She maintains that this is true even if her purpose in doing so was to place the child in another adoptive home rather than to raise the baby herself. She contends that the controlling issue is her intent to exercise her rights as a parent rather than her intent to place the child in another adoptive setting. She cites no case authority for this proposition and we know of none.

Civil Code section 232, subdivision (a)(1), describes those persons who are entitled to be declared free from parental custody and control. It states in pertinent part: "(a) Description of person. An action may be brought for

the purpose of having any child under the age of 18 years declared free from the custody and control of either or both of his or her parents when the child comes within any of the following descriptions: [¶] (1) Person abandoned by parents to care and custody of another; intent; support or communication with child. The child has been left without provision for the child's identification by his or her parent or parents or by others or has been left by both of his or her parents or his or her sole parent in the care and custody of another for a period of six months or by one parent in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent or parents, with the intent on the part of the parent or parents to abandon the child. The failure to provide identification, failure to provide support, or failure to communicate shall be presumptive evidence of the intent to abandon. If the parent or parents have made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent or parents."

Brittany was born on May 12, 1985; the J.'s brought her home the next day. Evette attempted to remove her on October 17, 1985. This was within the six-month period provided in the statute. All the decisions in this area focus on the "intent to abandon." (See, e.g., *In re B.J.B.* (1986) 185 Cal.App.3d · 1201 [230 Cal.Rptr. 332]; *Adoption of Oukes* (1971) 14 Cal.App.3d 459 [92 Cal.Rptr. 390]; *In re Morrow* (1970) 9 Cal.App.3d 39 [88 Cal.Rptr. 142].) ■ Civil Code section 232 requires an "intent to abandon" in general, not an intent to abandon to a specific person or couple. "The underlying purpose of section 232 is to serve the welfare and best interest of the child by providing him with the stability and security of an adoptive home where those conditions are otherwise missing from his or her life." (*In re Raymond H.* (1985) 175 Cal.App.3d 556, 564 [221 Cal.Rptr. 165].) This purpose would not be served by employing the interpretation urged by Evette. If the intent of a natural parent to "exercise parental rights" were found to be controlling rather than an intent to abandon the child by giving it up for adoption, then the natural parent could move the child on the 29th day of the 5th month ad infinitum until a "suitable" home is found. All hope of stability for the child would vanish.

■ Because it is the intent to abandon Brittany and not an intent to exercise a parental right which is controlling, Evette's attempt to remove the child on October 17, 1985, did not in and of itself preclude a finding of abandonment.

II. *Whether Substantial Evidence Supports the Trial Court's Finding of Abandonment.*

■ Evette next contends that there was not substantial evidence supporting the court's finding that Brittany had been left in the custody of the

J.'s for six months during which period Evette had the intent to abandon the child.

█ Findings under any subdivision of Civil Code section 232 must be made on the basis of clear and convincing evidence. (*In re Angelia P.* (1981) 28 Cal.3d 908, 919 [171 Cal.Rptr. 637, 623 P.2d 198].) █ Therefore, " 'the [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find [that termination of parental rights is appropriate based on clear and convincing evidence].' " (*Id.* at p. 924.) Substantial evidence includes circumstantial evidence and the reasonable inferences flowing therefrom. (*In re James D.* (1981) 116 Cal.App.3d 810, 813 [172 Cal.Rptr. 321].)

█ "A reviewing court must accept as true all evidence tending to establish the correctness of the findings of the trial judge. All conflicts in the evidence must be resolved in favor of the respondents and all legitimate and reasonable inferences must be indulged in to uphold the judgment. It is well settled that whenever a finding or judgment of the trial court is attacked as being unsupported, the power of the reviewing court begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted which will support the conclusions reached by the trial court [citation]. All evidence most favorable to respondents must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed [citation].

█ "That abandonment and intent under [former] section 701 [now § 232], subdivision (a) of the Welfare and Institutions Code are questions of fact for the trial judge is well established. His decision, when supported by substantial evidence, is binding upon the reviewing court. An appellate court is not empowered to disturb a decree adjudging that a minor is an abandoned child if the evidence is legally sufficient to support the finding of fact as to the abandonment [citations]. This is true, also, on the question of intent." (*In re Gano* (1958) 160 Cal.App.2d 700, 705 [325 P.2d 485].)

█ " 'In order to constitute abandonment there must be *an actual desertion,* accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' " (*In re George G.* (1977) 68 Cal.App.3d 146, 160 [137 Cal.Rptr. 201] and *In re Bisenius* (1959) 173 Cal.App.2d 518, 521 [343 P.2d 319], quoting *Guardianship of Snowball* (1909) 156 Cal. 240, 243 [104 P. 444].) This long-standing definition was used by the trial court in the instant case.

"The controlling issue for a finding of abandonment is the subjective intention of the parent." (*In re Christina P.* (1985) 175 Cal.App.3d 115, 131 [220 Cal.Rptr. 525].) "[T]he question whether such intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and circumstances of the case." (*In re Neal* (1968) 265 Cal.App.2d 482, 488 [71 Cal.Rptr. 300]; accord *In re Raymond H., supra,* 175 Cal.App.3d at p. 564; *In re Conrich* (1963) 221 Cal.App.2d 662, 668 [34 Cal.Rptr. 658].)

Although Evette testified that she finalized her intent to reclaim Brittany and rear her herself on the night of October 17, 1985, the trial court is not required to believe the natural parent's testimony as to her intent. (*In re B.J.B., supra,* 185 Cal.App.3d at p. 1212; *Adoption of Oukes, supra,* 14 Cal.App.3d at p. 467; *In re Bisenius, supra,* 173 Cal.App.2d at p. 522.) "Intent to abandon, as in other areas, may be found on the basis of an objective measurement of conduct, as opposed to stated desire." (*In re Rose G.* (1976) 57 Cal.App.3d 406, 424 [129 Cal.Rptr. 338].)

In its statement of decision, the court explained, "The court finds further that, despite the mother's testimony to the contrary, the mother never formed an intention to raise Brittany herself so as to alter the intent to abandon formed initially, and that the mother's efforts to obtain physical custody of Brittany in October of 1985 and subsequently were for the purpose of placing Brittany with another adoptive home and not for the purpose of raising her . . . ." Before issuing the statement of decision, the court had discussed its findings at length on the record. It stated specifically that "the Court does not give much weight to the birth mother's testimony . . . ." The court further found that "although the birth mother has changed her mind as to who the adopting parents should be, she has never formed an intent inconsistent with the intent to abandon, but, rather, has only intended to reclaim the child to place it elsewhere."

In the instant case, Evette told Officer Robinson and the J.'s that her intent was to place Brittany in another adoptive home because she had become dissatisfied with the situation at the J.'s home. Her counselor's notes reflecting their conversations during the day on which she had attempted to remove the child contained no reference to the fact that Evette had then expressed a desire to rear the child herself. The court questioned Ms. Casson specifically on this point. She stated that her notes indicated only that Evette did not want Brittany to remain with the J.'s, not that she wanted to parent the child herself. These facts, coupled with Evette's earlier expressions of intent to abandon the child and the fact that she herself testified that she did not know what she was going to do with the child if she recovered her on October 17, 1985, provide more than sufficient evidence on

which to base a finding that Evette had the requisite intent to abandon Brittany continuously throughout the statutory six-month period.

III. *Whether Substantial Evidence Supports the Trial Court's Finding of Detriment to the Child if Returned to the Natural Mother.*

Evette next contends that there was insufficient evidence to support the court's finding that returning the child to her would result in detriment to the child. Before a court may make an order awarding custody of a minor child to someone other than a parent, it must make a finding that an award of custody to the natural parent would be detrimental to the child. (Civ. Code, § 4600; *In re Carmaleta* (1978) 21 Cal.3d 482, 495 [146 Cal.Rptr. 623, 579 P.2d 514]; *In re Richard E.* (1978) 21 Cal.3d 349, 356 [146 Cal.Rptr. 604, 579 P.2d 495]; *In re Venita L.* (1987) 191 Cal.App.3d 1229, 1245 [236 Cal.Rptr. 859] and *In re B.J.B., supra,* 185 Cal.App.3d 1201, 1209.)

Here, the court did make the required finding. In the statement of decision, it stated: "The Court finds that returning Brittany to her mother's custody would be detrimental to her. The Court's finding of detriment is based in part upon the Court's determination that the mother does not intend to raise Brittany herself and in part upon the testimony of Dr. Janice Hapmaker [*sic*] to the effect that it would be detrimental to Brittany to separate her from petitioners with whom she has formed a phychological [*sic*] parent-child relationship. Based largely upon Dr. Hapmaker's [*sic*] testimony about the foreseeable immediate and long term effects of disrupting bonding once it has occurred, the Court also finds that freeing Brittany for adoption would be the least detrimental placement alternative open to the Court. The Court does not base its finding of detriment upon any proven parental inadequacies or unfitness of the mother."

Every witness who testified as to the effect upon Brittany of removing her from the J.'s home stated that this would be detrimental to her to one degree or another. The only differences among the witnesses were (1) disagreement as to whether or not the child would recover in a short period of time or whether this would have lasting serious effects, and (2) disagreement as to whether the long-term effects of the removal would be greater than any difficulties the child may experience later in life because of the knowledge that she was an adopted child. The court found the testimony of Dr. Hatmaker persuasive and found that the long-term effects of removing the baby after the bonding and trust-building stages had occurred would be detrimental to the child. Evette now wishes this court to substitute its judgment for that of the trial court and reach a different factual finding. "The decision of the court below will not be set aside unless a clear abuse of

discretion is shown." (*Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704 [117 Cal.Rptr. 856, 84 A.L.R.3d 654].) Substantial evidence supports the trial court's decision that detriment to the child would result if she were returned to her natural mother.

■■■ Evette also claims that the court was required to find that she was unfit as well as finding that detriment would result if the child were returned to her. She cites *In re Robert D.* (1984) 151 Cal.App.3d 391 [198 Cal.Rptr. 801] for this proposition. This reliance is misplaced. As the California Supreme Court has explained, "with the enactment of the Family Law Act, the standard of unfitness was dropped and the Legislature created the new rule that in order to award custody of a child to a nonparent the court was required to render a finding that an award to a parent would be 'detrimental to the child' and that such an award to a nonparent was 'required to serve the best interests of the child.' " (*In re B. G.* (1974) 11 Cal.3d 679, 695 [114 Cal.Rptr. 444, 523 P.2d 244].) "No showing of parental unfitness is required. [Citation.] Several cases have sustained findings of detriment where a stable, positive, 'de facto' parental relationship would be disrupted or destroyed by a change in custody." (*In re B.J.B., supra,* 185 Cal.App.3d 1201, 1209.) No further finding by the trial court was required.

## IV.  *Whether the Adoption Decree Is Void.*

■■■ Evette and appellate counsel for Brittany contend that because the judgment terminating parental rights was not final at the time the petition for adoption was granted, the decree of adoption is void. We agree. The decree of adoption itself recites that it is based upon the judgment entered in action No. 347036-6 pursuant to Civil Code section 232 declaring Brittany to be free from the custody and control of her parents. That judgment was signed and filed on June 13, 1986. Inexplicably, the decree of adoption was also signed and filed on June 13, 1986.

Civil Code section 238 provides: "Any order and judgment of the court declaring a minor person free from the custody and control of any parent or parents under the provisions of this chapter shall be conclusive and binding upon such minor person, upon such parent or parents and upon all other persons who have been served with citation by publication or otherwise as provided in this chapter. After making such order and judgment, the court shall have no power to set aside, change, or modify it, *but nothing in this section shall be construed to limit the right to appeal from such order and judgment.*" (Italics added.)

The notice of appeal was timely filed on August 11, 1986. The judgment terminating parental rights was not final at the time the decree of adoption was signed and filed and, because of the timely filing of the notice of appeal from that judgment, it is not yet final.

■ It is well established that the statutory requirements for an adoption are jurisdictional. "Unless they [the statutory requirements] coexist, the proceeding for adoption is insufficient, the attempted contract is invalid, the judge is without power to approve it, and there is no lawful adoption." (*Estate of Sharon* (1918) 179 Cal. 447, 454 [177 P. 283].) "[C]onsent of the natural mother (in situations other than those which are excepted by statute and which are not here pertinent) is a jurisdictional prerequisite to adoption." (*Adoption of Barnett* (1960) 54 Cal.2d 370, 377 [6 Cal.Rptr. 562, 354 P.2d 18]; *Adoption of Driscoll* (1969) 269 Cal.App.2d 735, 738 [75 Cal.Rptr. 382]; accord *Arnold* v. *Howell* (1950) 98 Cal.App.2d 202, 207 [219 P.2d 854].)

■ Our Supreme Court long ago explained: "Consent lies at the foundation of statutes of adoption, and under our law this consent is made absolutely essential to confer jurisdiction on the superior court to make an order of adoption, unless the conditions or exceptions exist specially provided by the statute itself and which render such consent of the parents unnecessary. Unless such consent is given, or, for the exceptional causes expressly enumerated is dispensed with, the court has no jurisdiction in the matter." (*Matter of Cozza* (1912) 163 Cal. 514, 522 [126 P. 161].)

■ Inasmuch as the judgment freeing Brittany from the custody of her natural parents in action No. 347036-6 was not yet final at the time the decree of adoption was granted in action No. 331205-5, the trial court had no jurisdiction to grant the adoption and the decree of adoption is void.

V. *Whether This Court Should Consider Events Occurring Subsequent to the Trial.*

■ Both Evette and counsel for the minor urge this court to consider information outside the record pursuant to Code of Civil Procedure section 909. Debbie has passed away since the entry of judgment on June 13, 1986, and they wish this court to include that fact as a factor in its decision. We decline to do so for the simple reason that fact would not be relevant to the appeal from the judgment in action No. 347036-6 freeing Brittany from the custody and control of her natural parents.

██ "The general rule is that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'" (*In re Elise K.* (1982) 33 Cal.3d 138, 149 [187 Cal.Rptr. 483, 654 P.2d 253].) "Although appellate courts are authorized to make findings of fact on appeal by Code of Civil Procedure section 909 and rule 23 of the California Rules of Court, the authority should be exercised sparingly. [Citation.] Absent exceptional circumstances, no such findings should be made." (*Tyrone v. Kelley* (1973) 9 Cal.3d 1, 13 [106 Cal.Rptr. 761, 507 P.2d 65].) Furthermore, in the absence of certain exceptions not here applicable, matters occurring after the entry of judgment are irrelevant and should not be entertained by the appellate court. (9 Witkin, Cal. Procedure (3d ed. 1985) §§ 252-254, pp. 258-261.)

VI. *Whether the Minor Was Deprived of Her Right to Counsel and Was Prejudiced Thereby.*

██ Counsel for the minor urges this court to hold that the minor in a Civil Code section 232 action has an unequivocal due process right to counsel and that Brittany was denied this right. As he himself indicates, this is not the state of the law.

In *In re Dunlap* (1976) 62 Cal.App.3d 428, 437 [133 Cal.Rptr. 310], the appellant contended that "(1) due process of law mandates that independent counsel be appointed for a child in a proceeding to free the child from control of his natural parent; and (2) Civil Code section 237.5 requires the appointment of counsel to represent the minor." The court did not reach the constitutional issue, holding that, under the circumstances of that case, Civil Code section 237.5 required that counsel for the minor be appointed. It held that counsel must be appointed "unless the circumstances indicate that the child's interests will be adequately represented although he does not have his own lawyer." (*Dunlap, supra,* at p. 438.)

Civil Code section 237.5 provides in pertinent part: "At the beginning of the proceeding on a petition filed pursuant to this chapter counsel shall be appointed as follows: [¶] (a) The court shall consider whether the interests of the minor require the appointment of counsel. If the court finds that the interests of the minor do require such protection, the court shall appoint counsel to represent the minor. If the court finds that the interests of the minor require the representation of counsel, counsel shall be appointed

whether or not the minor is able to afford counsel. The minor shall not be present in court unless the minor so requests or the court so orders."

The California Supreme Court dealt with the issue of a minor's right to counsel in a Civil Code section 232 proceeding in *In re Richard E., supra,* 21 Cal.3d 349. There the court expanded upon the *Dunlap* reasoning and held that "when the court finds a child has separate interests not protected in the contest between parents and a petitioner, the court must exercise its discretion by appointing separate counsel." (*Richard E., supra,* at p. 354.) The rule "requires counsel be appointed at the commencement of proceedings absent an immediate showing upon which the court can exercise its discretion against making an appointment." (*Id.* at p. 355.)

On the second day of trial, the court, on its own motion, ruled that counsel for the state Department of Social Services did not have standing in the Civil Code section 232 proceeding and appointed counsel to represent the minor. Appointed counsel was unable to attend for the second and third days of trial; the proceedings were tape recorded for him. Appellate counsel for the minor contends that not appointing counsel for Brittany until the second day of trial resulted in a denial of the minor's due process right to counsel.

No explicit finding was made that the minor had interests which would not be protected. However, this finding may be implied from the court's decision to appoint counsel. *Richard E.* requires that counsel be appointed "at the commencement of the proceedings." Not appointing counsel until the second day of trial was, therefore, error. However, in *Richard E.* the Supreme Court went on to hold that "failure to appoint counsel for a minor in a freedom from parental custody and control proceeding does not require reversal of the judgment in the absence of miscarriage of justice." (*In re Richard E., supra,* 21 Cal.3d at p. 355.) Here, as in *Richard E.,* "[t]here is nothing in the record of the instant proceeding suggesting the minor was prejudiced because [she] was not represented by independent counsel" on the first day of trial. (*Ibid.*) Any resulting error was harmless.

### DISPOSITION

The judgment in action No. 347036-6 freeing Brittany H. from the custody and control of her natural parents is affirmed.

The cause is remanded to the superior court for further proceedings consistent with the views expressed in this opinion.

Martin, Acting P. J., and Pettitt, J.,* concurred.

A petition for a rehearing was denied March 8, 1988, and the judgment was modified to read as printed above. Appellants' petition for review by the Supreme Court was denied May 18, 1988.

---

*Retired judge of the superior court sitting under assignment by the Chairperson of the Judicial Council.