Filed 3/30/16  In re L.M. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

|  |  |
|---|---|
| In re L.M., a Minor. | D068996 |
| CHRISTINA K. et al., | |
| Petitioners and Appellants, | (Super. Ct. No. AN15207) |
| v. | |
| ISAAC M., | |
| Objector and Respondent; | |
| L.M., | |
| Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harry M. Elias, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Appellant L.M., a Minor.

Patricia K. Saucier, under appointment by the Court of Appeal, for Petitioners and Appellants, Christina K. and Ruben Z.

Andrea R. St. Julian, under appointment by the Court of Appeal, for Objector and Respondent.

Christina K. and Ruben Z. appeal the denial of their petition to declare Christina's daughter, L.M., free from the custody and control of L.M.'s biological father, Isaac M. L.M. also appeals (together with Christina and Ruben, Appellants). Appellants contend substantial evidence did not support the court's finding that Isaac successfully rebutted the presumption that he abandoned L.M. They also argue it was in L.M.'s best interest to grant the petition. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

L.M. was born in 2005. Her parents, Christina and Isaac, had an on and off dating relationship. In 2007, Isaac was arrested and incarcerated for attempted murder. For some time while Isaac was incarcerated, Christina and L.M. maintained contact with him through phone calls, letters and visits.

In the fall of 2008, Christina ended her relationship with Isaac. She had begun a relationship with Ruben and, in December 2008, she was pregnant with his child. Around the same time that Isaac learned Christina was pregnant, he received a letter from her telling him to stop making promises to L.M. that he could not fulfill. Shortly thereafter, in January 2009, Isaac sent Christina a letter telling her that he knew she was pregnant and to move on with her life. He said he would stop calling Christina and would tell his family to leave her alone. Isaac asked that Christina's new boyfriend take

2

care of L.M.  Isaac wrote the letter because he was emotional and angry and did not want to hurt L.M. as a result of his incarceration.  He stated he regretted the letter and never intended to abandon L.M.

According to Isaac, he continued to call Christina at the maternal grandmother's home in an attempt to speak to L.M.  However, no one answered his calls and he did not leave messages.  After sending the January 2009 letter, Isaac attempted to call approximately once a month for six months and then occasionally thereafter until he was sent to state prison in 2011.  Christina was not aware of Isaac's attempts to contact her after his January 2009 letter.

The last time Isaac saw L.M. was in May 2009.  On that instance, Isaac's mother took L.M. to see him.  Shortly thereafter, Christina limited L.M.'s contact with paternal relatives and at some point discontinued it.  On an occasion in 2010, Christina refused to allow L.M.'s paternal relatives to visit and threatened to call the police if they did not leave.

During his incarceration, Isaac sent L.M. letters and drawings.  Until 2011, he sent some of the correspondence to Christina's address.  He never received a response.  In 2009, Isaac sent at least two drawings to L.M. that said, "love you, [my daughter]."  He addressed those items and other correspondence to L.M., but mailed them to his family's address because he was afraid that L.M. was not receiving anything from him and hoped that his family would deliver the items.  Isaac also decided to send the letters to his family's address because he had learned that his contact with Christina made Ruben angry.

3

Isaac's mother and sister attempted to deliver his letters for L.M. to Christina, but Christina "shrugged [them] off." At some point, Isaac's family told him they could not deliver the letters because Ruben was very jealous and they did not want to cause any conflict between Ruben and Christina. L.M.'s paternal grandmother saved some of Isaac's letters to L.M., but had also lost some as result of repeated moves.

After an appeal in Isaac's criminal case, the court struck gun and gang enhancements attached to Isaac's attempted murder conviction. As a result, Isaac was granted parole in November 2014. Shortly thereafter, he reached out to Ruben through a mutual acquaintance and asked to see L.M. Christina denied the request.

In March 2015, Christina and Ruben filed a petition to declare L.M. free from Isaac's custody and control, freeing L.M. for adoption by Ruben. Isaac opposed the petition. In a report prepared by the San Diego County Health and Human Services Agency (Agency) under Family Code section 7822, the Agency's social worker recommended that Isaac's parental rights be terminated because Isaac had not seen or contacted L.M. since 2009 and had not supported her financially due to his incarceration. (All further statutory references are to the Family Code.)

The court conducted a trial in late 2015. The court received into evidence the Agency's report, copies of Isaac's and Christina's correspondence, photographs, and drawings. The court also heard testimony from Christina, Ruben, Isaac, Isaac's sister, and Isaac's mother. After considering the evidence and assessing the witnesses' credibility, the court denied Christina's and Ruben's petition.

The court found that Isaac's January 2009 letter to Christina demonstrated his intent to abandon L.M. However, the court also found that Isaac wrote the letter in a "fit of pique" as a result of discovering Christina was with another man and pregnant with the other man's child. Additionally, the court believed Isaac wrote the letter because he thought he was going to prison for life and thought it would be best for L.M. to move on.

In regard to Isaac's contact with L.M., the court found he made more than token efforts, but those efforts were rebuffed by Christina. The court also found it troubling that Christina limited L.M.'s contact with paternal family members because they did not do anything wrong. The court ultimately found that although there was a presumption that Isaac abandoned L.M, there was not a showing by clear and convincing evidence that he truly intended to abandon her.

## DISCUSSION

### I. *General Legal Principles and Standard of Review*

A proceeding to have a child declared free from the custody and control of a parent may be brought under section 7822 where "[t]he child has been left . . . [¶] [by] [o]ne parent . . . in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(2), (3).) A parent's "failure to provide support, or failure to communicate" with the child for a period of one year or more is presumptive evidence of the intent to abandon. (§ 7822, subd. (b).) The statutory presumption of intent to abandon a child, like any other rebuttable presumption, may be overcome by opposing evidence. (*In re Gano* (1958) 160

5

Cal.App.2d 700, 706.)  To overcome the statutory presumption, the parent must make more than token efforts to support or communicate with the child.  (*In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1212.)  The parent's efforts should also show a genuine desire to maintain the parental relationship.  (*Ibid.*)

Intent to abandon is a question of fact that may be found by objectively measuring the parent's conduct.  (*In re B.J.B.*, *supra*, 185 Cal.App.3d at p. 1212.)  The juvenile court considers the frequency of the times the parent tried to communicate with the child, the genuineness of the effort under all the circumstances, and the quality of the communications that occurred.  (*Ibid.*; *People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316.)  " ' " 'In order to constitute abandonment there must be an actual desertion, accompanied with an intention to entirely sever, so far as it is possible to do so, the parental relation and throw off all obligations growing out of the same.' "  [Citations.]' " (*In re Jacklyn F.* (2003) 114 Cal.App.4th 747, 754.)

"To terminate parental rights on grounds of abandonment, the trial court must find intent to abandon 'by clear and convincing evidence.' " (*In re B.J.B.*, *supra*, 185 Cal.App.3d at p. 1211.)  "However '[that] standard is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard.' [Citation.]" (*Ibid.*)  Under that review standard, we " . . . 'must accept as true all evidence tending to establish the correctness of the findings of the trial judge.  All conflicts in the evidence must be resolved in favor of the respondent[] and all legitimate and reasonable inferences must be indulged in to uphold the judgment. . . .

6

[W]henever a finding or judgment of the trial court is attacked as being unsupported, the power of the reviewing court begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted[,] which will support the conclusions reached by the trial court. . . . If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed [citation].' " (*In re Brittany H*. (1988) 198 Cal.App.3d 533, 549.)

II. *Substantial Evidence Supports Court's Finding of No Intent to Abandon*

Appellants argue the evidence showed Isaac made no more than token efforts to contact L.M., especially between January 2009 and January 2010. As a result, Appellants assert Isaac failed to rebut the presumption that he abandoned L.M. We reject Appellants' arguments because there was sufficient evidence to rebut the presumption of intent to abandon.

In January 2009, Isaac wrote a letter to Christina telling her to move on with her life and asking that Ruben take care of L.M. Isaac also stated that he would stop calling. On its face, this letter suggested Isaac intended to abandon L.M. However, Isaac testified that he wrote the letter as an emotional outburst and because he did not want to hurt L.M. as a result of his incarceration. Further, despite the letter, he continued to try to call L.M. once a month for six months and then occasionally thereafter. Isaac also continued to send L.M. letters and drawings, sometimes to Christina's address and other times to his family's address. Contrary to Appellants' arguments, the record contains at least two items of correspondence from Isaac to L.M. in 2009, which Isaac had sent to his family's address. Isaac's mother testified that she may have lost other letters as result of frequent

7

moves. According to Isaac, he mailed items for L.M. to his family's house because he was afraid that she was not receiving the items he sent to Christina's address and hoped his family would deliver his correspondence to L.M. Under all of the circumstances, this evidence supported the trial court's finding that Isaac made more than token efforts to communicate with L.M. and showed that despite his January 2009 letter, he had a genuine desire to maintain a relationship with her.

Appellants contend evidence of Isaac's attempts to call and correspond with L.M. did not overcome the presumption of his intent to abandon because he never left messages when his calls were not answered and his mail did not reach L.M., especially during the statutory time period between January 2009 and January 2010. Further, L.M. argues neither Christina nor Ruben prevented Isaac from having contact with her. However, the trial court found that Christina rebuffed Isaac's efforts to contact L.M. This finding was supported by the evidence. Isaac's sister testified that Isaac constantly asked about how L.M. was doing. Isaac's sister attempted to keep in contact with L.M., but around 2009, Christina stopped responding to her contact attempts. Christina also stopped allowing L.M. to have overnight visits with paternal relatives, which prevented them from taking L.M. to visit Isaac. Further, according to Isaac's sister, she told Christina about Isaac's letters to L.M. in 2009, but Christina "shrugged it off." Thus, Isaac's failure to actually reach or have contact with L.M. does not support a finding that he intended to abandon her.

We also reject L.M.'s argument that Isaac abandoned her because his incarceration was voluntary and cannot be used as an excuse for his lack of efforts to be a parent.

8

Although this argument has intuitive appeal, it is not a sufficient basis for a termination of parental rights under California law. California courts have long recognized that a noncustodial parent's incarceration is insufficient to show abandonment under section 7822, subdivision (a)(3). (See *In re T.M.R.* (1974) 41 Cal.App.3d 694, 699-700; see also *In re Brittany S.* (1993) 17 Cal.App.4th 1399, 1402; *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1011-1012.) An incarcerated parent who makes meaningful efforts to maintain a relationship with the child does not necessarily forfeit his or her parental rights. (*In re T.M.R.*, at pp. 699-700.) "[T]he involuntary termination of parental rights [is] a 'drastic remedy which should be resorted to only in extreme cases of neglect or abandonment.' " (*Neumann v. Melgar* (2004) 121 Cal.App.4th 152, 163 (*Neumann*); see *Hoversten v. Superior Court of San Luis Obispo County* (1999) 74 Cal.App.4th 636, 641.)

Appellants are essentially asking this court to reweigh the evidence and reach a contrary finding. However, we have "no power to pass on the credibility of witnesses, resolve conflicts in the evidence or determine the weight of the evidence." (*In re E.M.* (2014) 228 Cal.App.4th 828, 839.) While we may have reached a contrary result, we must resolve conflicts in the evidence in favor of the respondent. (*In re Brittany H.*, *supra*, 198 Cal.App.3d at p. 549.) Under that standard, we are constrained and will not disturb the trial court's finding where, as here, it is supported by substantial evidence. (*Ibid.*)

Further, Appellants' focus on a best interests analysis does not advance their position. Although always a relevant consideration in juvenile proceedings, the child's

9

best interests is not a factor in the court's initial determination whether a parent abandoned his or her child under section 7822, subdivision (a)(3). (*In re Baby Boy S.* (1987) 194 Cal.App.3d 925, 933 ["Absent intent on the part of the parents to abandon the child . . . the best interests and welfare criteria are simply not applicable"].) It is only after the court finds parental abandonment that the issue of the child's best interests comes into play. If the court finds abandonment, the court must then consider the child's best interests in the determination whether to terminate parental rights. (See *Neumann*, *supra*, 121 Cal.App.4th at p. 156; *In re Marcel N*. (1991) 235 Cal.App.3d 1007, 1014-1015.)

Finally, we note that the evidence showed that L.M. is in a safe, stable, and loving environment with Christina and Ruben. To the extent Christina and Ruben believe that communications between Isaac and L.M. are not in L.M.'s best interests, they may raise those issues in family court proceedings. Like the trial court, we express no opinion on visitation between Isaac and L.M.

DISPOSITION

The judgment is affirmed.

McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P.J.

NARES, J.

10