Filed 5/23/16  In re K.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


In re K.B., et al., Persons Coming Under the Juvenile Court Law,

SAN DIEGO COUNTY HEALTH & HUMAN SERVICES AGENCY,

      Plaintiff and Respondent,

      v.

DANIEL B.,

      Defendant and Appellant.

D068879

(Super. Ct. No. CJ1112ABC)


APPEAL from orders of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.


Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Daniela Davidian, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Brittany Murphy for Minor.

Appellant in this juvenile dependency appeal is Daniel B. (Father), the presumed father of three children — K.B., D.B. and A.B. (together, the Minors). Father appeals from orders of the juvenile court (Orders) following a contested selection and implementation hearing at which the court identified adoption as the permanent placement goal and ordered a search for an adoptive home to be completed within 180 days. (Welf. & Inst. Code, § 366.26, subd. (c)(3); all further statutory references are to this code unless stated otherwise.) Father argues that the record does not contain substantial evidence to support the following two findings the court made in support of its Orders: (1) there is a probability of adoption for each of the Minors; and (2) Father did not establish that the benefit to any of the Minors of maintaining the parent-child relationship with him outweighed the benefit to the Minors of adoption. We disagree.

Because the record contains substantial evidence in support of each of the challenged findings, we will affirm the Orders.

I.

STATEMENT OF THE CASE

A.    *Section 300, Subdivision (b) Petitions*

In December 2012, a social worker on behalf of the San Diego County Health and Human Services Agency (Agency) filed three petitions, one on behalf of each of the Minors, alleging that each of the Minors needed the protection of the juvenile court. At

2

the time, K.B. (a boy) was six years old, D.B. (a boy) was five years old and A.B. (a girl) was three years old.

Substantively, the Agency alleged Father and Patrice J. (Mother) failed to protect the Minors and failed to provide for their support in violation of section 300, former subdivision (b) and subdivision (g), respectively.[1] More specifically, the Agency alleged: Mother left the Minors with a custodian who was unable to care for the Minors and locked them out of his home (as a means of discipline) without adequate clothing; Mother exposed the Minors to domestic violence between her and her boyfriend; and since Mother was incarcerated and Father could not be located, the Minors were left without appropriate or adequate care.

B.   *Postpetition Proceedings*

Leading up to the section 366.26 selection and implementation hearing in August 2015, the juvenile court presided over a number of hearings, including: a detention hearing, at which the court found Father to be the presumed father of the Minors and detained the Minors; a contested adjudication and disposition hearing, at which the court dismissed the count in the petition that Mother failed to provide support (§ 300, subd. (g)), took jurisdiction, declared the Minors to be dependents of the court, removed the Minors from Mother's custody, placed the Minors in confidential foster homes, and ordered reunification services for Mother and Father; and six-, 12- and 18-month review

---

[1]   Former section 300, subdivision (b) has since been amended, and the pertinent language is unchanged and now found in subdivision (b)(1) of section 300. (Stats. 2014, ch. 29, § 64.) Subdivision (g) has remained unchanged.

3

hearings, at which the court closely monitored the well-being of the Minors and the substantive progress of the case plans for Mother and Father, ultimately terminating services for Father at the 12-month review hearing and for Mother at the 18-month review hearing.[2]

At the time the Minors were detained in December 2012, they were unruly, hyperactive and disobedient. They each had scratches, bruises and injuries, and reported physically fighting on a regular basis. K.B., the six-year-old boy, had never attended school. In the initial detention report, the Agency advised that Mother and her boyfriend were in custody, charged with drug-related crimes and awaiting further proceedings. The Agency learned from the Minors' paternal great-grandmother, Janie G., that Father was on probation and participating in a substance abuse program.[3]

By the time of the jurisdiction and disposition hearing in late January 2013, the Agency updated its earlier report. Father had been raised by Janie G. and was now living at an in-patient drug rehabilitation center. Mother had been raised by her maternal grandparents and was currently incarcerated. K.B. and D.B. were aggressive and bit, fought and swore. In addition, D.B. had difficulty with communication, fine motor,

---

[2]    From the December 2012 detention hearing until the August 2015 selection and implementation hearing, the juvenile court presided over at least 33 hearings — some minor, some significant. Although we do not describe all the hearings and court rulings, the record on appeal confirms that at all times the juvenile court was interested, concerned and very involved in managing the case — both in overseeing the welfare of the Minors and in protecting the rights of Mother and Father.

[3]    Father had been in prison for three years for possession of drugs. Father and Mother had not seen each other since May 2012.

4

problem solving and personal/social skills. A.B. was described as "very sweet" with difficulties in her communication and gross motor skills. The Minors were living at Polinsky Children's Center.

In addenda prepared for the adjudication and disposition hearing in mid-March 2013, the Agency reported that Mother was still incarcerated and Father's whereabouts were unknown after having been " 'kicked out' " of his residential treatment facility. The Minors were detained in separate foster care placements. K.B. was adjusting well to school, although his caregiver reported that he did not listen and had difficulty sitting still. D.B. was having difficulty at school, exhibiting inappropriate " 'sexualized behavior,' " and overall displaying the most trauma of the three Minors. A.B.'s educational needs were still being assessed, and she had begun to display "sexualized behaviors" at home. All three Minors had poor social skills and knew no boundaries.

During the reunification phase — i.e., from the adjudication and disposition hearing in March 2013 through the permanency review hearing (§ 366.21 18-month review hearing) in August 2014 — the Minors were moved from their separate foster home placements to the care of their paternal great-grandmother, Janie G. (Caretaker). K.B. was receiving psychotropic medication for symptoms that included inattention, hyperactivity, impulsivity, anger, aggression and defiance. D.B. was receiving psychotropic medication for symptoms that included severe hyperactivity, impulsivity, poor attention, distractibility, aggression and self-injury. In school, K.B.'s academics had improved, although he continued to have problems with constant movement, interruption and aggression. D.B. was suspended from school for biting and hitting staff. The

5

Caretaker reported that A.B. behaved aggressively at times. Mother had been incarcerated, and a condition of her release was that she register as a sex offender. At different times during this period, Father was incarcerated, on parole, tested positive for methamphetamine, not in contact with the Agency, living in Kansas, and homeless with his whereabouts unknown. Neither Mother nor Father made much progress with their respective case plans.

C.      *Section 366.26 Selection and Implementation Hearing*

In a chambers conference prior to the contested section 366.26 selection and implementation hearing in August 2015, Minors' counsel requested that the court proceed under section 366.26, subdivisions (b)(4) and (c)(3).[4] Counsel for the Agency, Mother and Father agreed; and the court so ordered.

---

[4]     Section 366.26, subdivision (b) statutorily prioritizes seven options for the juvenile court at the selection and implementation hearing. Subdivision (c) provides the court with direction in choosing among the seven alternatives in subdivision (b).

Section 366.26, subdivision (c)(3) states in relevant part: "If the court finds that termination of parental rights would not be detrimental to the child pursuant to [section 366.26, subdivision (c)(1)] and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child, within the state or out of the state, within a period not to exceed 180 days. . . . For purposes of this section, a child may only be found to be difficult to place for adoption if there is no identified or available prospective adoptive parent for the child because of the child's membership in a sibling group, or the presence of a diagnosed medical, physical, or mental handicap, or the child is seven years of age or more."

Section 366.26, subdivision (b)(4) provides in relevant part that, where the juvenile court makes a finding under subdivision (c)(3), the court is required to "identify adoption . . . as the permanent placement goal and order that efforts be made to locate an appropriate adoptive family for the child within a period not to exceed 180 days."

The section 366.26 hearing proceeded by way of a documents trial. The court received into evidence a report and five addenda from the Agency, a report from the Minors' Court Appointed Special Advocate (CASA) and the social worker's resume. The court then considered the oral arguments presented by counsel for the Agency, the Minors, Mother and Father. Father and the social worker were also present, and the Caretaker participated by telephone.

At the time of the hearing, K.B. was almost nine years old, D.B. had just turned eight, and A.B. was six. All three of the Minors were happier in their current placement with the Caretaker than in their prior foster placements. That said, all three of the Minors were also having issues and physically fighting with other children in the apartment complex.

K.B., who was abused as a younger child, suffered from attention deficit hyperactivity disorder and oppositional defiant disorder. He was still taking psychotropic medication and receiving individual therapy. Although the therapist and the Caregiver continued to report hyperactivity and defiance issues at home, they both reported an improvement. In school (second grade), K.B. had made significant progress both academically and behaviorally, and he had begun participating in after-school sports.

D.B. also suffered from attention deficit hyperactivity disorder and oppositional defiant disorder, as well as posttraumatic stress disorder and certain physical ailments. He, too, was still taking psychotropic medication and had been receiving individual therapy and behavioral coaching, but he had exhausted all of his therapeutic behavior services. D.B. continued to have difficulty with boundaries and recently had regressed in

7

terms of coping and exhibiting sexualized behaviors, although the incidents of unacceptable behavior had "significantly decreased" since his initial placement in foster care. He required constant supervision and redirection. In school (first grade), D.B. continued with both academic and behavioral issues, showing no signs of improvement; indeed, his inappropriate sexualized behavior had increased. By early 2015, D.B. had been sent home from school several times as a result of aggression to students and staff. By mid-2015, he had been expelled for five days; shortly thereafter, for his and others' safety, D.B. was moved to a new school where he was placed in a smaller class with better supervision and special education services. Additional security precautions, including locked windows and a harness during transportation, were taken to keep him from running away.

Due to her age, A.B. had not been evaluated for behavioral services until just a few months prior to the hearing. The results of the initial testing indicated strong development skills with average to below average functioning in attention and emotional skills. In school (kindergarten), A.B. started out doing well, but recently had suffered "a 'major slide' " according to her teacher. In particular, A.B. inappropriately touched her peers. Academically, A.B. performed below average.

In early 2015, Father went to the Caretaker's home high on methamphetamine; Mother was there for a visit with the Minors, and Father threatened her with a knife in the

8

presence of the Minors.[5]  Just weeks later Father was arrested for and ultimately convicted of rape by force or fear, and at a status conference in April 2015 Minors' counsel advised the court that Father had been sentenced to five years in prison.  When not in custody or out of state, Father frequently visited the Minors, but he never progressed past supervised visitation.[6]  Although Father was helpful and responsive to the Minors, according to the social worker who supervised a visitation, he "played more of a secondary than parental role."

By mid-2015, Mother was homeless and unemployed with allegations that she continued to be involved in criminal activity.  She had not kept in contact with the Agency.  During a supervised visit, Mother engaged with the Minors, but did not demonstrate a knowledge of child development or an awareness of their needs for her attention, even as they sought it.

The Agency's initial report in December 2014 disclosed that the Agency had approved:  13 possible San Diego families willing to adopt a child matching K.B.'s characteristics; 19 possible San Diego families willing to adopt a child matching D.B.'s characteristics; 28 possible San Diego families willing to adopt a child matching A.B.'s characteristics; and 7 possible San Diego families willing to adopt a sibling group

---

[5]     Father, who suffered from schizophrenia, admitted to hearing voices and being noncompliant with his medication.  The police who responded to the call placed him on a psychiatric hold.

[6]     At one point in time during early 2014 prior to the 12-month review hearing, Father was precluded from visiting K.B. because of a condition of Father's probation.

matching these Minors' characteristics.  In an addendum filed less than two weeks before the hearing in August 2015, the Agency updated this initial disclosure and reported that it had approved:  four possible San Diego families willing to adopt a child matching K.B.'s characteristics; three possible San Diego families willing to adopt a child matching D.B.'s characteristics; two possible San Diego families willing to adopt a child matching A.B.'s characteristics; and one possible San Diego family willing to adopt a sibling group matching these Minors' characteristics.  The Agency further set forth what efforts it would undertake in the event it was unable to effect one of these San Diego placements, concluding:  "We feel confident we would be able to place these children for adoption, if they ended up needing an adoptive family."

In addition to those potential placements, at the time of the initial report in December 2014, the then-current Caregiver was willing to adopt all three Minors.  Although her ability to care for them was questionable given her age and related health issues, by the time of the hearing in August 2015, another relative also was willing to adopt the Minors.  This out-of-state maternal great aunt had spent 10 days with the Caretaker and Minors in May 2015, and the four of them travelled to the great aunt's home for a six-week visit in June and July 2015.

The Agency advised that adoption would not change the nature of the Minors' relationship with Father.  For that and other reasons, the Agency explained, the section

366.26, subdivision (c)(1)(B)(i) exception to terminating parental rights based on the beneficial parent-child relationship did not apply.[7]

Thus, in its initial report, as to each of the Minors, the Agency recommended in part: "[I]t is likely the child will be adopted, and none of the exceptions set forth in [section] 366.26, subdivision (c)(1)(B) appl[ies]." This recommendation remained constant in all five addenda that the Agency filed during the eight months between the initial report in December 2014 and the hearing in August 2015. Consistently, the CASA's report recommended adoption for all three Minors.

Based on the foregoing, as relevant to the issues on appeal, the juvenile court found that, for purposes of section 366.26, subdivision (c)(3), there is a probability of adoption for each of the Minors; and Father did not meet his burden of establishing that the benefit to any of the Minors of maintaining the parent-child relationship outweighed the benefit of adoption. The court ordered, as relevant to the issues on appeal: parental rights are not terminated; for a period of time up to 180 days, the Agency is to conduct search efforts for adoptive parents within and outside the state; and the Agency is to notify the court and counsel of updated information regarding prospective adoptive homes, including specifically the potential adoption by the great aunt. The court continued the section 366.26 hearing for approximately 180 days.

---

7    As we discuss at part II.B., *post*, Father's challenge to the finding that the benefit to the Minors of adoption outweighed maintaining the parent-child relationship is the same as the challenge to a finding that the exception set forth in section 366.26, subdivision (c)(1)(B)(i) does not apply in a situation where parental rights are terminated.

11

Father timely appealed from each of the Orders [8]

## II.

## DISCUSSION[9]

In choosing among the options available to the juvenile court at the section 366.26 selection and implementation hearing, "[i]f the court finds that termination of parental rights would not be detrimental to the child pursuant to" section 366.26, subdivision (c)(1) "and that the child has a probability for adoption but is difficult to place for adoption and there is no identified or available prospective adoptive parent, the court may identify adoption as the permanent placement goal and without terminating parental rights, order that efforts be made to locate an appropriate adoptive family for the child, within the state or out of the state, within a period not to exceed 180 days." (§ 366.26, subd. (c)(1)(D) & (c)(3).)  After the 180-day period, the court is required to hold another hearing under section 366.26, subdivision (b).  (§ 366.26, subd. (c)(3).)

Thus, before deferring selection of a permanent placement plan under section 366.26, subdivision (c)(3), the juvenile court must make at least three findings: the child has a probability of adoption, termination of parental rights would not be detrimental to the child, and the child is difficult to adopt for specified reasons.  (*In re Gabriel G.* (2005) 134 Cal.App.4th 1428, 1436 (*Gabriel G.*).)  Here, Father challenges

---

[8]     The juvenile court filed a separate identical order for each of the Minors.  The Orders are appealable under section 395.  (*In re S.B.* (2009) 46 Cal.4th 529, 537 (*S.B.*).)

[9]     The Minors join in the arguments and position of the Agency on appeal.  (Cal. Rules of Court, rule 8.200(a)(5).)  Mother did not appear in the appeal.

the first two of these findings by arguing there is insufficient evidence that the Minors had a probability for adoption and that the termination of his parental rights would not be detrimental to the Minors.[10] In this latter regard, Father contends that the benefit the Minors derived from their relationship with him outweighed the benefit they would derive from adoption. (See § 366.26, subd. (c)(1)(B)(i).)

Given Father's challenge to the sufficiency of the evidence in support of the two findings, we will review the findings for substantial evidence.[11] (*Gabriel G.*, *supra*, 134 Cal.App.4th at p. 1438.)

In our consideration of the substantiality of the evidence here, all presumptions are in favor of the Orders, and Father has the burden of establishing reversible error. (*In re Sade C.* (1996) 13 Cal4th 952, 994.) We consider the evidence in the light most favorable to the Agency (as respondent), giving it the benefit of every reasonable inference and resolving all conflicts in support of the Orders. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) We do not reweigh evidence, evaluate credibility of witnesses or consider inferences contrary to the juvenile court's findings. (*In re Michael G.* (2012) 203 Cal.App.4th 580, 589 (*Michael G.*).) Evidence from a single

---

[10]     Father does not dispute that the record contains substantial evidence that, for purposes of section 366.26, subdivision (b)(3), each of the Minors qualifies as "difficult to place."

[11]     Although the parties point out to us what they consider to be a split of authority as to the appropriate standard of review, they are in agreement that we should apply the substantial evidence standard. *Based on the specific issues and arguments presented by Father*, we agree with the parties that the two challenged findings in the Orders are to be reviewed on appeal for substantial evidence.

document may be sufficient (Evid. Code, § 411), whereas even uncontradicted evidence in favor of Father (as appellant) does not establish the fact for which the evidence was submitted (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890). All evidence favorable to the Agency (as respondent) " 'must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact.' " (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549 (*Brittany H.*).) As particularly applicable here, we must affirm the Orders if the challenged findings are supported by substantial evidence, "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota H.*); accord, *K.F. v. Superior Court* (2014) 224 Cal.App.4th 1369, 1383, fn. 7 ["The fact that contrary evidence exists which could support a different finding is not the test."].) The issue is not whether there is evidence in the record to support a finding Father wishes *had been made*, but whether there is evidence that, if believed, would support the finding *actually made*. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 872-873.)

Given these standards, Father did not meet his burden of establishing a lack of substantial evidence to support the two findings he challenges on appeal.

A.      *Substantial Evidence Supports the Finding That the Minors Had a Probability for Adoption*

As part of its decision to apply section 366.26, subdivision (c)(3), the juvenile court found that there is "a probability for adoption" of each of the Minors. Father's position on appeal is that the record does not contain substantial evidence from which the

14

juvenile court could have found "clear and convincing evidence to support its finding for a probability of adoption."

Before we discuss the substantiality of the evidence, we note that the juvenile court did not find a probability of adoption by *clear and convincing evidence*, but rather by *a preponderance of the evidence*. However, we need not — and do not — decide the standard to be applied in the first instance by the juvenile court, since Father does not argue that the court erred in making its finding based on a preponderance of the evidence. Notably, our role is unaffected, since " ' "on appeal from a judgment required to be based upon clear and convincing evidence, 'the clear and convincing test disappears . . . [and] the usual rule of conflicting evidence is applied, giving full effect to the respondent's evidence, however slight, and disregarding the appellant's evidence, however strong.' " ' " (*In re A.S.* (2011) 202 Cal.App.4th 237, 247 (*A.S.*).)

The parties spend a great deal of time in the briefing discussing the evidence of favorable and unfavorable behaviors and characteristics of each of the Minors. However, that evidence is unnecessary to our determination, given that the Agency presented evidence that there were, indeed, potential adoptive placements for each of the Minors.[12] More than that is not required.

---

[12]    While we need not and do not base our decision on the Minors' ages, health, development, emotional states and physical appearances as suggested in *Gabriel G.*, *supra*, 134 Cal.App.4th at page 1438, we note that the record does contain favorable evidence in many of those categories for each of the Minors. To the extent the record also contains substantial evidence to the contrary, as Father emphasizes, we do not consider it in our analysis. (*A.S.*, *supra*, 202 Cal.App.4th at p. 247 [we " ' " 'disregard[] the appellant's evidence, however strong' " ' "]; *Dakota H.*, *supra*, 132 Cal.App.4th at

The evidence regarding the probability for adoption was uncontradicted.[13]  As of two weeks before the section 366.26 hearing, the Agency had approved:  four possible San Diego families willing to adopt a child matching K.B.'s characteristics; three possible San Diego families willing to adopt a child matching D.B.'s characteristics; two possible San Diego families willing to adopt a child matching A.B.'s characteristics; and one possible San Diego family willing to adopt a sibling group matching these Minors' characteristics.  In addition, an out-of-state great aunt was willing to adopt the Minors.[14]  Finally, the Agency set forth certain specific recruitment efforts it could undertake — both in and out of California — if it were unable to effect one of the San Diego placements, concluding:  "We feel confident we would be able to place these children for adoption, if they ended up needing an adoptive family."

In arguing that "[t]here were no approved prospective adoptive parents . . ." for the Minors, Father either ignores the evidence we recite in the previous paragraph or assumes that the approved prospective adoptive parents must have already agreed to adopt K.B.,

---

p. 228 [we do not take into account substantial evidence contrary to the juvenile court's ruling]; *Brittany H.*, *supra*, 198 Cal.App.3d at p. 549 [we " 'discard[]' " unfavorable evidence].)

[13]    Our colleagues in Division Three have explained that under section 366.26, subdivision (c)(3), "probability" in the clause "probability for adoption" "does *not* mean ' "more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*." ' "  (*In re Y.R.* (2007) 152 Cal.App.4th 99, 108-109, disapproved on other grounds in *S. B.*, *supra*, 46 Cal.4th at p. 537, fn. 5.)

[14]    Although the great aunt had not yet been investigated as a potential adoptive parent, within the three months prior to the hearing, she had visited the Minors for 10 days, and the Minors had visited her at her home for six weeks.

D.B. and A.B. This latter assumption — namely, that if the public agency is unable to identify a specific adoptive parent for a specific child, then there is no substantial evidence of a probability for adoption — is not the appropriate standard, since section 366.26, subdivision (c)(3) expressly provides for the 180 days and related procedures for the public agency to locate a specific adoptive parent.

For these reasons, the record on appeal contains substantial evidence to support the finding that each of the Minors had "a probability of adoption" for purposes of section 366.26, subdivision (c)(3).

B. *Substantial Evidence Supports the Finding That the Benefit to the Minors of Adoption Outweighed the Benefit of Maintaining Father's Parent-Child Relationship with the Minors*

As part of its decision to apply section 366.26, subdivision (c)(3), the juvenile court found that Father did not meet his burden of establishing that the benefit to any of the Minors of maintaining a father-child relationship outweighed the benefit of adoption. Father argues that substantial evidence does not support this finding.

Where adoption is being considered as a permanent plan under section 366.26, subdivision (c) — and here the issue was whether adoption would be a permanent placement *goal* (§ 366.26, subd. (c)(3)) — the juvenile court may not terminate parental rights where the parent makes a sufficient showing that termination of those rights would be detrimental to the child under one of the statutory exceptions. (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.) The statutory exception at issue here is the beneficial relationship exception to adoption, which applies when the termination of parental rights would be detrimental to the child, based on a showing that: (1) "[t]he parents have maintained

17

regular visitation and contact with the child"; and (2) "the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)[15]

The statutory phrase "benefit from continuing the relationship" (§ 366.26, subd. (c)(1)(B)(i)) refers to a parent-child relationship that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Autumn H.*, *supra*, 27 Cal.App.4th at p. 575.) The beneficial parent-child relationship exception will apply "only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Ibid.*)

To meet the burden of proof to establish this beneficial relationship, "the parent must show more than frequent and loving contact, an emotional bond with the child, or pleasant visits — the parent must show that he or she occupies a parental role in the life of the child." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1527 (*I.W.*); accord, *In re*

---

15     In the present appeal, the juvenile court found that when Father was not in custody, he maintained regular visitation and contact with the Minors. Thus, as we introduced *ante*, we are concerned only with the substantiality of the evidence in support of the finding that the benefit of maintaining the parent-child relationship did not outweigh the benefit of adoption.

*Jason J.* (2009) 175 Cal.App.4th 922, 936-937 (*Jason J.*); *In re Derek W.* (1999) 73 Cal.App.4th 823, 827 (*Derek W.*).) The evidence must establish more than merely "a loving and happy relationship" (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1419), and the parent must be more than " 'a friendly visitor' " (*Jason J.*, at p. 938). "A child who has been adjudged a dependent of the juvenile court should not be deprived of an adoptive parent when the natural parent has maintained a relationship that may be beneficial to some degree, but that does not meet the child's need for a parent." (*In re Angel B.* (2002) 97 Cal.App.4th 454, 466.)

Notably, "a challenge to a juvenile court's finding that there is no beneficial [parent-child] relationship amounts to a contention that the 'undisputed facts lead to only one conclusion.' " (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) That is not the case here.

As the evidence showed, Father's visits with the Minors did not demonstrate that he ever took on a parental role. According to the Agency's early report at the detention hearing in December 2012, the Minors identified Mother's boyfriend as their father, and by the time of the selection and implementation hearing almost three years later in August 2015, the social worker who observed a recent visit reported that Father "played more of a secondary than parental role." Indeed, the record contained evidence that Father had been precluded from visiting K.B. as a condition of probation at one time, Father had been incarcerated or out of the state much of the time, and Father never

19

progressed past supervised visitation at any time.[16] In addition, Father had a history of engaging in violent behavior — which included, during the underlying dependency proceedings, slapping A.B. at a supervised visit, threatening Mother with a knife in front of the Minors and being convicted of rape by force or fear. The record is replete with evidence of Father's connection with and regular use of illegal drugs: he began using marijuana at the age of 12 or 13 and PCP at the age of 16; he was serving a sentence for possession or purchase of cocaine when Mother was pregnant with A.B.; during the reunification period, he twice tested positive for methamphetamine; and in 2015, after commencement of the section 366.26 hearing, he was high on methamphetamine in front of the Minors at the Caretaker's home. Finally, in preparation for the section 366.26 selection and implementation hearing, the social worker — i.e., the person most knowledgeable of the family dynamics and the standard to be applied — reported that, although the Minors know, respond to and love Father,[17] "the benefits of permanency

---

[16] Father was incarcerated at the time of the selection and implementation hearing, and earlier Minors' counsel reported that Father recently had begun a five-year prison sentence. In issuing its ruling, the juvenile court expressly found that, to the extent Father's incarceration precluded meaningful contact with the Minors, Father had been in control of the situation by engaging in activity that resulted in his confinement.

[17] We acknowledge this evidence and other evidence cited by Father that arguably supports the strength of the relationship between Father and the Minors. However, we do not consider such evidence in determining whether the record contains substantial evidence in support of the juvenile court's findings. (*A.S.*, *supra*, 202 Cal.App.4th at p. 247; *Dakota H.*, *supra*, 132 Cal.App.4th at p. 228; *Brittany H.*, *supra*, 198 Cal.App.3d at p. 549.) Otherwise, we would be reweighing the evidence, which we are precluded from doing. (*Michael G.*, *supra*, 203 Cal.App.4th at p. 589.)

outweigh any detriment the [Minors] may suffer if Father's parental rights were terminated."

Based on this evidence, the juvenile court reasonably could conclude either that Father did not establish that he "occupies a parental role in the life of the child" (*I.W.*, *supra*, 180 Cal.App.4th at p. 1527) or that Father's relationship with each of the Minors "b[ore] no resemblance to the sort of consistent, daily nurturing that marks a parental relationship" (*Derek W.*, *supra*, 73 Cal.App.4th at p. 827). In short, Father failed to establish that any of the Minors "had any needs only [Father] can satisfy, or that [any of the Minors] has the type of emotional attachment to [Father] that would cause [any of the Minors] to be greatly harmed if parental rights were terminated." (*Jason J.*, *supra*, 175 Cal.App.4th at p. 938.)

Accordingly, the juvenile court did not err in finding that Father failed to meet his burden of establishing that the benefit to the Minors of maintaining a parent-child relationship with them outweighed the benefit of adoption.

DISPOSITION

Each of the three orders filed August 19, 2015, is affirmed.


IRION, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.

22