Filed 8/15/16  In re Cash L. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re CASH L. et al., Minors. | D069585 |
| C.L. et al.,<br><br>Petitioners and Respondents,<br><br>v.<br><br>AMBER L.,<br><br>Objector and Appellant. | (Super. Ct. No. A60512) |

APPEAL from a judgment and order of the Superior Court of San Diego County, Edlene C. McKenzie, Commissioner, and Robert J. Trentacosta, Judge.  Affirmed.

Donna Balderston Kaiser, under appointment by the Court of Appeal, for Objector and Appellant.

Stocks & Colburn and Janis K. Stocks for Petitioners and Respondents.

Amber L., the biological mother of Cash L. and David L. (together, the boys), appeals from a judgment terminating her parental rights under Family Code

section 7822[1] so the boys could be adopted by their stepmother, petitioner C.L.  Amber contends insufficient evidence supported the court's finding that she abandoned the boys.

Further, after judgment was entered, the court denied Amber's request for rehearing.  She contends she was entitled to a rehearing because she did not stipulate to have a court commissioner (Commissioner McKenzie) act as a temporary judge in this case and Commissioner McKenzie is otherwise assigned to be a juvenile court referee whose findings are subject to review under Welfare and Institutions Code section 252.

We conclude Amber impliedly stipulated to Commissioner McKenzie's acting as a temporary judge in this case and substantial evidence supports the court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2004, Amber and the boys' biological father, Casey L., got married.  The next year, Cash was born, and in late 2006, David was born.  The family's standard of living was middle class, Casey worked in sales, and Amber was primarily a stay-at-home mom after the boys were born.

Beginning in 2007, Amber developed a drinking problem.  On one occasion, Casey returned home from a business trip, found Amber "passed out," the two young children unsupervised, and the oven on.  In another incident, Casey came home, found the children "running around with feces on them," and Amber in her underwear, drunk.  She was admittedly stressed, suffering anxiety, and possibly depressed, from having to care for the boys, Casey's frequent traveling for work, and the family's unstable financial

---

1    Further statutory references are to the Family Code unless otherwise stated.

2

situation. By 2010, their marriage significantly deteriorated. Amber took the boys out-of-state for a supposed two-week trip, and after she did not return, Casey filed for divorce in Orange County where the family was living at the time.

After various court proceedings, their divorce finalized in June 2011. At the time, both parties were employed and Amber earned approximately $1,700 per month as a caretaker and house cleaner. As to the boys, the parents had joint legal custody, Casey had primary physical custody, and Amber had visitation rights, including two weekends a month plus every Wednesday afternoon. The judgment prohibited either parent from being under the influence of alcohol during his or her period of custody/visitation and allowed either parent to request "random drug testing" of the other parent.

For a while, Amber's visits proceeded without incident, but her drinking problem continued. In August 2011 during one of her visitation periods, Amber drove under the influence of alcohol. In April 2012, when dropping off the boys at Casey's front door, Amber appeared "extremely drunk," and he requested drug testing. In September 2012, a court ordered her to wear a device that measures blood alcohol levels at regular intervals (SCRAM bracelet), attend five Alcoholics Anonymous (AA) meetings per week, and obtain an AA sponsor.

In April 2013, the Orange County court held a hearing to determine whether visitation rights should be modified. Amber did not appear at the hearing in-person or via telephone. The court suspended her visitation rights "until such time that [she] presents herself to the Court seeking a modification of this order." The court stated she had not

3

shown proof of compliance with its orders, although it accepted Casey's representation that she was still wearing the SCRAM bracelet.

From April 2013 until mid-2015, Amber took no steps to modify the court's order suspending her visitation rights, and she had no physical contact or visits with the boys. She was "working to get sober," but struggled because some of her family members liked to drink. She had approximately six phone calls with the boys between 2013 and 2014 and three phone calls with them the next year, each call lasting a few minutes, and she bought them Christmas and birthday gifts. Casey permitted the boys to speak to her on the phone and he picked up some of the gifts she bought for them. After their divorce, Amber did not pay Casey any amount of money for child support or child care expenses. In January 2015, they discussed Amber's possible reunification with the boys, but she did not follow through with seeing a counselor.

Meanwhile, Casey and C. (together, petitioners) married in September 2014 after several years of living together. She was employed as a nurse and had been involved in Cash and David's lives since they were little boys. C. taught Cash "how to parent," brought stability and love to their home, and always put their "family first." In June 2015, they filed a petition to have the boys declared free from Amber's custody and control under section 7822. The petition alleges Amber intended to abandon the boys, and for at least one year beginning in April 2013, she had provided no financial support for them, had not visited them, and had only token communications with them.

On August 14, 2015, the court (Commissioner McKenzie) appointed counsel for Amber and separate counsel for the boys, set dates for a pretrial status conference and

4

trial, and instructed the parties on other routine procedures. That same day, petitioners' counsel and the boys' counsel signed and filed a stipulation appointing Commissioner McKenzie as a judge in the case. Amber (or her counsel) did not object to the stipulation after it was filed and did not request an alternative judge. In October 2015, the court held a pretrial status conference attended by all parties. Again, Amber did not object to Commissioner McKenzie presiding and did not request an alternative judge.

The San Diego Health and Human Services Agency (the Agency) interviewed Casey, Amber, Cash, and David, and recommended in its November 2015 report to the court that the petition be granted. The Agency stated, "the mother has not visited with her children since April 2013. The mother has sent token cards, gifts and letters and her telephone efforts appear to be token as well." The Agency additionally reported both boys wanted to be adopted by C. Ten-year-old Cash stated C. "is a good mom," remembered seeing his birth mother Amber over two years ago, and did not remember receiving a card, gift, or letter from her. Eight-year-old David could not remember the last time he saw Amber, but vaguely remembered receiving a couple of gifts from her.

On November 13, 2015, trial commenced. Amber did not dispute her lack of support, lack of visits since April 2013, and limited communications, but principally attributed these events to her financial situation. For example, she testified she did not attend the April 2013 court hearing because she had no gas money to get to Orange County and had not sought to modify the visitation order because she could not afford an attorney. She testified about becoming homeless in March 2012 and living out of her car or storage unit. Occasionally, she stayed in an apartment. Although she was capable of

5

working as a salesperson or caregiver, she did not fully explain why she had been unable to consistently do so or save more money. When asked whether she was an alcoholic, she responded, "I could say I have drank."

The court took judicial notice of the Orange County court's June 2011 judgment and 2013 order, received the Agency's reports into evidence, and considered the testimony of Casey, Amber, and a social worker at trial. After taking the case under submission, it granted the petition.

The court recounted the factual background, noted there was no dispute that Amber had not visited the boys since April 2013, and the primary dispute was her *reason* for not visiting. The court concluded Amber's testimony did not sufficiently explain why she had no contact or "meaningful plan to restart visitation" with the boys from April 2013 until December 2014. Irrespective of her financial resources, Amber had shown a "complete lack of outward interest in seeing her boys for a period of at least one year and eight months." The court discussed how Amber could have done "something" during that period to see her children, including reaching Orange County using public transportation if necessary to explore her case options. After concluding that Amber abandoned the boys, the court found that C. had provided the boys with structure, stability, and love, and it was in their best interests to be adopted by her.

Soon after the court's decision was rendered, Amber filed a form entitled "Application for a Rehearing of a Matter Heard by Referee" that cites Welfare and Institutions Code section 252. Her stated reason for requesting rehearing was: "Matter was heard by Commissioner Edlene McKenzie." In December 2015, the court

6

(Judge Trentacosta) invited the parties to file briefs regarding: (1) whether the rehearing process provided by Welfare and Institutions Code section 252 applied, and (2) whether Commissioner McKenzie was sitting as a court commissioner, juvenile court referee, or a temporary judge, during the trial. Petitioners filed a brief, arguing the proceeding was governed by the Family Code, not the Welfare and Institutions Code, and the Family Code contains no provision for a rehearing after trial. They also argued Amber had stipulated to Commissioner McKenzie's acting as a temporary judge.

In January 2016, the court held a special hearing, announced it had read petitioners' brief, and denied Amber's rehearing request. This appeal followed.

DISCUSSION

I

Amber argues she was entitled to a rehearing under Welfare and Institutions Code section 252 because Commissioner McKenzie was assigned by the superior court to sit as a juvenile court referee. Further, she disputes stipulating to Commissioner McKenzie's acting as a temporary judge in this case.[2]

We conclude that while adjudicating a dispute under the Family Code, Commissioner McKenzie was not acting in the capacity of a juvenile court referee. The powers of a juvenile court and its referees exist by virtue of the Welfare and Institutions

---

2     Amber did not previously oppose petitioners' argument that Commissioner McKenzie was acting as a temporary judge, and Amber did not submit written points and authorities in response to the court's invitation. Accordingly, having presented no previous arguments concerning Commissioner McKenzie's status, Amber arguably forfeited her claim. Nevertheless, we will exercise our discretion and address the issue on its merits.

7

Code.  (Welf. & Inst. Code, §§ 245 ["Each superior court shall exercise the jurisdiction conferred by this chapter, and while sitting in the exercise of such jurisdiction, shall be known and referred to as the juvenile court."], 248, subd. (a) ["A referee shall hear those cases that are assigned to him or her by the presiding judge of the juvenile court"].)  The instant proceeding is governed by the Family Code, which vests jurisdiction in superior courts.  (Fam. Code, §§ 200, 7820 et seq.)  Thus, in this case, Commissioner McKenzie was not acting as a juvenile court referee and the rehearing procedures provided in the Welfare and Institutions Code did not apply.

On the record before us, Commissioner McKenzie was sitting by stipulation as a temporary judge.  Parties may stipulate to a subordinate judicial officer, i.e., a court commissioner, acting as a temporary judge in a specific proceeding.  (*In re Courtney H.* (1995) 38 Cal.App.4th 1221, 1227; Code of Civ. Proc., § 259, subd. (d).)  So stipulated, a commissioner has the same power as a judge.  (*Elena S. v. Kroutik* (2016) 247 Cal.App.4th 570, 575-576.)  Under the doctrine of tantamount stipulation, a stipulation need not be express, but may be implied by conduct.  " '[A]n *implied* stipulation arises from the parties' common intent that the subordinate judicial officer hearing their case do things which, *in fact*, can only be done by a judge.' "  (*Courtney H.*, at p. 1227.)  A litigant may not "participate in the hearing, gamble on a successful outcome, and then, only after receiving an unfavorable ruling, decide to object to a commissioner handling the case."  (*Elena S.*, at p. 575.)

From case inception through judgment, Amber voiced no objection to Commissioner McKenzie's acting in the case as a judge.  She did not object to petitioners'

8

and the boys' filed stipulation to appoint Commissioner McKenzie as a temporary judge. After the stipulation was filed, Amber fully participated in hearings and a trial. As a result, she impliedly stipulated to appoint the commissioner as a temporary judge. The court properly denied Amber's request for rehearing.

II

Amber next challenges the sufficiency of evidence to support the court's finding of abandonment. A petition for freedom from a parent's custody and control may be granted where "[o]ne parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication from the parent, with the intent on the part of the parent to abandon the child." (§ 7822, subd. (a)(3).) The statute "shall be liberally construed to serve and protect the interests and welfare of the child." (§ 7801.)

The court's findings must be supported by clear and convincing evidence. (§ 7821.) "However '[that] standard is for the guidance of the trial court only; on review, our function is limited to a determination whether substantial evidence exists to support the conclusions reached by the trial court in utilizing the appropriate standard.' " (*In re B.J.B.* (1986) 185 Cal.App.3d 1201, 1211.)

" 'A reviewing court must accept as true all evidence tending to establish the correctness of the findings of the trial judge. All conflicts in the evidence must be resolved in favor of [petitioners] and all legitimate and reasonable inferences must be indulged in to uphold the judgment. It is well settled that whenever a finding or judgment of the trial court is attacked as being unsupported, the power of the reviewing

9

court begins and ends with the determination of whether there is any substantial evidence, contradicted or uncontradicted which will support the conclusions reached by the trial court [citation]. All evidence most favorable to [petitioners] must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact. If the evidence so viewed is sufficient as a matter of law, the judgment must be affirmed [citation].' " (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549 (*Brittany H.*).) " 'The appellant has the burden of showing the finding or order is not supported by substantial evidence.' " (*Adoption of Allison C.* (2008) 164 Cal.App.4th 1004, 1011 (*Allison C.*).)

As a threshold matter, Amber contends there is insufficient evidence she "left" the boys in Casey's care to support an abandonment under section 7822. She argues there was no "leaving" because the Orange County court suspended her visitation rights. We reject her contention.

"[R]epeated inaction in the face of [a] custody order" may provide substantial evidence a parent has voluntarily surrendered her parental role and thus "left" the child within the meaning of section 7822. (*In re Amy A.* (2005) 132 Cal.App.4th 63, 70 (*Amy A.*); cf. *Allison C.*, *supra*, 164 Cal.App.4th at p. 1012 [father's actions, including driving under the influence, which led to his incarceration, were voluntary acts and supported he "left" his daughter in the mother's care and custody].) In *Amy A.*, the court rejected the father's arguments that he did not physically desert or "leave" his daughter because it was the mother who moved away. (*Amy A.*, at p. 69.) The record showed that,

irrespective of the judicial custody order, he failed to stay involved in his daughter's life or provide funds for her care. (*Id.* at p. 70.)

Here, Amber chose not to comply with court orders designed to ensure her children's safety and wellbeing (i.e., sobriety during visitation periods), and then failed to appear at the April 2013 hearing to show she could safely parent them during visits. Subsequently, she made no efforts to have the order modified despite being familiar with court processes. Substantial evidence shows that Amber was capable of working, attending AA meetings, and taking action to regain her visitation rights. She could have prevented the initial suspension of those rights or done something afterward to restore them; she was not compelled or coerced to disobey court orders and remain inert. Under the circumstances, sufficient evidence supported that Amber voluntarily surrendered her parental role and "left" the boys within the meaning of section 7822. (*Amy A.*, *supra*, 132 Cal.App.4th at p. 69.)

Amber further contends the evidence does not support she intended to abandon the boys. " '[The] question whether such intent to abandon exists and whether it has existed for the statutory period is a question of fact for the trial court, to be determined upon all the facts and circumstances of the case.' " (*Brittany H.*, *supra*, 198 Cal.App.3d at p. 550.)

A parent's "failure to provide support[ ] or failure to communicate" with the child for a period of one year or more "is presumptive evidence of the intent to abandon," and "[i]f the parent [has] made only token efforts to support or communicate with the child, the court may declare the child abandoned by the parent . . . ." (§ 7822, subd. (b).) The parent need not intend to abandon the child permanently; rather, an intent to abandon the

11

child during the statutory period is sufficient. (*In re Daniel M.* (1993) 16 Cal.App.4th 878, 885 (*Daniel M.*) [construing predecessor statute].)

Based on our review of the record, substantial evidence supports Amber's intent to abandon the boys for at least one year after April 2013. It is essentially undisputed she did not develop a meaningful plan to restart visitation, did not visit them or provide any financial support, did not consistently work despite being physically able to, had infrequent and insignificant communications, and did not outwardly express an interest in the welfare of her children. Although the court mostly believed Amber's testimony, it did not believe her in one important respect—her stated reason for not seeing the children. The court believed she abandoned them, due possibly to multiple stressors in her life.

Moreover, substantial evidence supports that Amber's efforts to communicate with the boys were merely token. The court apparently credited the testimony of Casey and the social worker since its findings are largely premised on their testimony or documents they submitted and/or prepared. Contrary to her arguments, Casey did not prevent Amber from communicating with the boys or regaining her visitation rights. The record shows he supported coparenting prior to her drinking incidents, he facilitated the few calls she made, and when she bought gifts for the boys, he drove and picked them up from her at a convenience store. The court could reasonably conclude Amber's lack of resources did not adequately explain why she could not more frequently communicate with the boys. In 2015, Casey arranged for a counselor to talk to her, but again, Amber failed to follow through.

Amber makes a number of arguments to dispute the court's finding of abandonment, none of which we find persuasive. She asserts her failure to provide financial support or frequently communicate did not establish a presumption of abandonment because, according to her, they are merely evidence of her being poor and homeless. Her argument lacks merit because the trial court did not rely on any presumptions or base its decision on her financial status. Instead, it considered all of the evidence, including her disinterest in visitation and token communications, and determined under all the circumstances, Amber intended to abandon the boys. The court fully accepted she had very limited means, but found nonetheless she had sufficient resources to take steps to modify the court's visitation order had she desired to see her children. It was the lack of any "outward interest" in seeing the boys for one year and eight months that convinced the court she intended to abandon them during that period.

Amber asserts the court erred by stating she struggled with anxiety and alcohol between April 2013 and December 2014. We conclude the court's observation is supported by substantial evidence. Based on Amber's circumstances, the court could reasonably infer that her anxiety, for which she previously took prescribed medication, was untreated and ongoing. In addition, Casey testified Amber told him she was struggling to maintain sobriety when she moved to Reno, Nevada, after April 2013. Indeed, she was unable to fully explain why she could not "get [her] act together" and stay employed. The court did not err.

Amber argues her December 2014 plans to begin therapy and coparenting were inconsistent with an intent to abandon, but her plans by that point in time are not relevant.

13

The proper inquiry is whether she intended to abandon the boys during the one-year statutory period alleged in the petition. (*Daniel M.*, *supra*, 16 Cal.App.4th at p. 885 ["Simply stated, a child cannot be abandoned and then put 'on hold' for a parent's whim to reunite."].) Additionally, Amber relies on cases like *In re Cattalini* (1946) 72 Cal.App.2d 662 (*Cattalini*), to support her position, but those cases are factually distinguishable. For example, during the time period of alleged abandonment, the father in *Cattalini* was "expressly discouraged" by his former spouse from providing support for their daughter, but "responded readily and eagerly" when he was asked to do so. (*Id.* at p. 671.) Further, he "kept insisting that he had no intention of giving up his children" and petitioner in *Cattalini* did not dispute the father continued communicating with his children "directly and indirectly." (*Id.* at pp. 667, 668.) In contrast, there is no evidence here that Amber was discouraged from providing support, communicating more frequently, or modifying the visitation order. During the relevant timeframe, she did not once relay to Casey (or anyone) a plan to regain visitation rights and see her children again. The court could reasonably find she intended to abandon the boys.

Amber also argues the court erred by considering the boys' best interests as part of its abandonment finding. We disagree. The court already found she abandoned the boys and provided the reasons for its decision before going on to find that adoption by C. would be in their best interests.

Finally, we need not address Amber's argument regarding the unconstitutionality of terminating her parental rights based on poverty. She forfeited the claim by not raising it below. (See *In re S.B.* (2004) 32 Cal.4th 1287, 1293.) Moreover, as we have

14

discussed, the court did not terminate her parental rights based on poverty. She has not established any ground for reversal.

DISPOSITION

The judgment terminating Amber's parental rights and order denying her request for rehearing are affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:


AARON, J.


PRAGER, J.[*]

---

[*]    Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.