Filed 8/17/16  In re J.M. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.M., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | D069410 |
| Plaintiff and Respondent, | (Super. Ct. No. CJ1262) |
| v. | |
| SHANE M., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Laura J. Birkmeyer, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

Dependency Legal Group of San Diego and Brittany Murphy for Minor.

The juvenile court detained J.M. and ultimately declared him a dependent of the court when he was four and a half months old.  Shane M., J.M.'s presumed father, appeals from the December 2015 order in which the court sustained the allegations in the petition filed by the San Diego County Health and Human Services Agency (Agency), exercised jurisdiction over J.M., and required Shane's contact with J.M. to be supervised.  Shane argues that the record on appeal does not contain substantial evidence to support the finding of jurisdiction and that the juvenile court erred in requiring Shane's time with J.M. to be supervised.  We disagree and will affirm the order.

I.

PROCEDURAL AND FACTUAL BACKGROUND[1]

Nichole T. gave birth to J.M. in July 2015.[2]  From the time of J.M.'s birth through the proceedings that underlie this appeal, Shane and Nichole resided together at St. Vincent de Paul Village (the Village) in San Diego.[3]  At all relevant times, Shane was 29 years old, and Nichole was 20 years old.

---

[1]     "In accord with the usual rules on appeal, we state the facts in the manner most favorable to the dependency court's order."  (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1448, fn. 1.)

[2]     All dates are in the year 2015 unless stated otherwise.

[3]     The Agency describes the Village as a " 'one-stop center to address all of the rehabilitative needs of the homeless . . . .' "

A.     *The Petition (Oct. 8)*

In late September, when J.M. was two months old, the Agency received a referral

through the child abuse hotline concerning J.M.'s living conditions and care.  The Agency

followed up with an investigation that included interviews on at least seven dates during

the last week in September and first week in October.  On October 8, the Agency filed

the underlying petition on behalf of J.M., alleging jurisdiction based on a failure to

protect under Welfare and Institutions Code section 300, subdivision (b).[4]  On October 9,

the Agency filed a detention report that contained the results of its investigation and

interviews.

1.     *Shane's Mental Health*

During its investigation, the Agency learned that Shane has cerebral palsy and past

diagnoses of bipolar disorder, depression, hallucinations, dysplasia and polysubstance

dependence (nicotine, alcohol and marijuana) with a history of 30 in-patient psychiatric

---

[4]     "A child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court:  [¶] . . . [¶]  (b)(1) The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."  (Welf. & Inst. Code, § 300); further undesignated statutory references are to the Welf. & Inst. Code.)
        At times the parties and the juvenile court cited section 300, subdivision (b), and at times they cited section 300, subdivision (b)(1).  At all times the only relevant applicable statute is section 300, subdivision (b)(1).

3

treatments and 18 suicide attempts since the age of 20. Shane's most recent hospitalization was in April 2013, following depression and suicidal thoughts, at which time he received mental health treatment for nine days. During this treatment, Shane was prescribed and took one medication for his depression and another medication to cope with his psychotic thoughts and auditory hallucinations.[5] He has not been to a psychiatrist since then, because he understood that if he returned to a mental health facility then he "would be 'committed.' " Shane stopped taking all prescribed medication at or around the end of 2013, approximately one and a half years prior to J.M.'s birth, because he does not believe they work for him.

Shane acknowledged that he still suffers from " 'massive depression, bipolar, and hallucinations.' " In particular, for at least the past 11 years, he has heard " 'evil' " voices from his past life that tell him to hurt people, and he currently hears these voices *every day*. As an example, Shane reported that the voices tell him to throw " 'Molotov cocktails with rags dipped in wine and gasoline at people.' " Just prior to one of the interviews, Shane heard the evil voices and responded by yelling at a random person on the street, and when he heard the evil voices a week earlier, Shane responded by " 'shutting down.' "[6]

---

[5]    Shane refused to take at least two other medications that were recommended.

[6]    The social worker did not explain what she understood Shane to mean when he said that he " 'shut[] down.' "

Shane manages his mental health issues — which includes dealing with the evil voices — by smoking marijuana.[7] In fact, he smokes marijuana "on a regular basis," even when he does not hear the voices. He never smokes in J.M.'s presence or in the family's room at the Village. Shane knew that his marijuana use jeopardized his ability to reside at the Village, because the Village is a sober living facility; but he would leave rather than discontinue smoking marijuana.

Whenever Shane hears the evil voices and cannot control himself, he either hurts himself or leaves the room. Nichole confirmed this latter behavior. Shane insists that he would never hurt J.M. or Nichole, describing a past instance when he was unable to control himself and told Nichole to take J.M. and leave the room.

The social worker suggested that Shane needed assistance with his mental health issues and, in the meantime, that Nichole needed to be responsible for J.M. at all times. Shane would not agree; he refused to participate in any services, stating that he would continue with his current plan (i.e., when he heard voices, he would hurt himself or leave the room).

2. *J.M.'s Care*

On the social worker's first visit to investigate the referral at the end of September, she observed that the family's living area was "messy" — with trash, clothing and dirty diapers on the floor and the beds, which had no sheets.

---

[7]     Shane has a prescription medical marijuana card.

Nichole explained that two-month-old J.M. slept in a car seat because he did not like the bassinet.

Nichole reported feeling overwhelmed by the dual responsibilities of caring for her newborn, J.M., and her disabled partner, Shane. When she experiences these feelings, Nichole copes by either talking to the wall, refusing to respond to Shane, or leaving altogether. In this latter circumstance, Shane necessarily has full responsibility for J.M., since Nichole will not entrust the care of J.M. to anyone other than Shane.

Nichole acknowledged that Shane and she need to keep their living area cleaner, indicating that she planned to do so as well as she could. In particular, there was an issue about bottles of urine being kept throughout the room based on the initial referral to the Agency. Although the social worker did not see bottles of urine on her first visit, in response to her inquiry Nichole explained that they belonged to Shane, who does not throw them away. Shane admitted that he urinates in containers, justifying the behavior on the basis that when he is caring for J.M. alone he is not able to hold J.M. and use the toilet at the same time.

When the social worker asked Nichole about the bottles of lice shampoo on the floor, Nichole explained that another resident at the Village had lice. For this reason, Nichole also shaves her head.[8]

---

[8]     At the same interview, Nichole inconsistently reported that she and Shane both shave their heads so that they will match J.M.

J.M. appeared happy during the visit, although he had a severe diaper rash. Nichole stated that the doctor had given her two prescriptions for the rash, but that she had only obtained one because the other was not covered by Medi-Cal.

Two days later, the social worker spoke to Shane by phone. Shane reported that the pediatrician had seen J.M. earlier that day, that J.M. had body lice and was diagnosed with scabies, and that Shane had not purchased the prescribed cream because he and Nichole had not completed their Medi-Cal paperwork. The social worker encouraged Shane to go to the welfare department and obtain the medication immediately, informing Shane that he needed to contact the social worker once Shane obtained the medication; but Shane never notified the social worker.

The next day, at a safety mapping meeting with the social worker, the parents and staff from the Village, Shane refused to agree to any safety plan for J.M., specifically rejecting the option of caring for the child in a public setting like the lobby of the Village. Nichole initially would not agree to be responsible for J.M. on a fulltime basis (because she gets overwhelmed and needs time alone to relieve stress), but she later agreed that she would always care for J.M. During the meeting, there were times when Shane did not properly support J.M.'s head and other times when Shane inappropriately fed J.M. while he (J.M.) was in a prone position.

In a telephone conversation with the social worker later that week, Nichole stated that she did not see anything wrong with how Shane had held and fed J.M. at the safety mapping meeting. Both Shane and Nichole refused any further services from the

Agency. Two days later, at an announced visit, Nichole indicated that she was willing to participate in services; Shane indicated that he would prefer going to court.

3. *The Agency's Allegations*

Based on the information gathered during the investigation, in an October 8 petition, the Agency alleged that J.M. needed the protection of the juvenile court based on Shane's untreated mental health issues and Nichole's failure to protect J.M. given Shane's untreated mental health issues.

More specifically, the Agency alleged: "The child has suffered or there is a substantial risk that the child will suffer, serious physical harm or illness, by the inability of the parent or legal guardian to provide regular care for the child due to the parent's or legal guardian's mental illness, developmental disability or substance abuse. [¶] On or about and between Sept. 28, 2015 to present, the father had a mental illness, including, as evidenced by, but not limited to, the father reports that [he] has a diagnosis of bipolar and major depression and that he hears evil voices that tell him to hurt other people and himself. He does not take medication prescribed for his illness as he says it does not work. He uses marijuana to treat the voices instead, because it calms him. The father was hospitalized 30 times in the last 10 years for mental health issues, the last time being 2 years ago. Father will not seek treatment because he says he will be committed. Father urinates in open containers and leaves them around the home where he and the mother care for the child. Mother lets father care for the child despite knowing he hears voices and despite advice not to, which rendered them incapable of providing regular care for said child and said child is in need of the protection of the Juvenile Court."

8

B.    *The Detention Hearing (Oct. 9)*

At the detention hearing on October 9, based on the evidence in the October 9 detention report, the juvenile court ruled that the Agency made a prima facie showing of the truth of the allegations in the petition regarding the parents' failure to protect J.M. Although both the Agency and J.M. argued for an out-of-home detention, the court allowed J.M. to remain in his parents' custody, pending further hearing, on a number of conditions, including that Shane not be allowed to be alone with J.M. The court also ordered that the Agency provide the parents with certain voluntary services.

Finally, the juvenile court set a hearing on jurisdiction for November 2.[9]

C.    *The Evidence in the Agency's Jurisdiction and Disposition Report (Nov. 2)*

Less than a week after the detention hearing, a San Diego police officer received a radio call that J.M. was not receiving proper care. The officer was told that J.M. had active scabies and a rash; that the family's room at the Village was still " 'nasty' " after having been asked seven different times to clean it; and that the parents were being evicted from the Village.

Speaking with the social worker on the telephone, the officer explained that she had located Shane, Nichole and J.M. on a street corner in downtown San Diego. The officer reported that Shane told her he still hears voices and still self-medicates with marijuana even though he overdosed (on an undisclosed drug) two years earlier. The

---

[9]    By separate order at the detention hearing, the juvenile court declared Shane to be J.M.'s presumed father.

officer observed that Shane did not hold J.M.'s head properly and had minimal supplies for J.M. Nonetheless, having been shown the court order granting custody to the parents, having received information that the Village was giving the parents another chance to comply with its requirements, and having seen that J.M. looked healthy and clean, the officer allowed J.M. to remain in his parents' care.

Approximately one week later, on October 21 the social worker visited Shane, Nichole and J.M. in their room. In response to Shane's statement that he did not understand why the Agency was involved, the social worker explained the Agency's concern of potential harm to J.M., including the specific worry that Shane's failure to seek treatment for his mental health condition may result in Shane taking action on the voices he hears — which necessarily put J.M. at risk of harm. Shane assured the worker that he would not act on the voices, other than leaving the room when he hears them.

Shane confirmed that he still smokes marijuana regularly, explaining that he does not smoke in J.M.'s presence and does not keep or smoke marijuana at the Village. Shane also reported a past alcohol addiction with occasional current alcohol use, stating that he had not binged or passed out from alcohol in the past four years.

Observing that Nichole used an improper ratio of formula to water when preparing a bottle for J.M., the social worker corrected Nichole and explained the adverse physical reaction the child might suffer with such a mixture.

Contending throughout the interview that he "felt bullied" by the Agency,[10] Shane ultimately refused to speak with the social worker. Already laying on the bed, Shane covered himself with his sleeping bag blanket and did not participate further.

The next day, pursuant to an agreement reached during the October 21 interview, Shane and Nichole were drug-tested. Shane's results were positive for marijuana metabolite, and Nichole's results were negative.

D. *The Jurisdiction and Disposition Hearing (Nov. 2)*

On November 2, the juvenile court held the jurisdiction and disposition hearing. (See § 355.) The court received and considered the Agency's October 9 detention report and the November 2 (filed Oct. 29) jurisdiction and disposition report. The Agency recommended that custody remain with the parents; that Shane not be allowed unsupervised time with J.M. (with discretion to the Agency to lift the requirement of supervision); that family maintenance services be ordered; and that Shane and Nichole be ordered to undergo a psychological evaluation.

Shane and Nichole each denied the jurisdictional allegations in the petition and requested a trial.[11] The court set dates for a settlement conference and a contested adjudication and disposition hearing.

---

[10]     At one point during the middle of the interview, Shane asked for and received permission to videotape the visit.

[11]     J.M. did not join in the request for a trial.

E.    *The Evidence in the Agency's Addendum Report (Nov. 19)*

In preparation for the November 19 settlement conference, the Agency submitted an addendum that contained the social worker's report of two meetings with the family after the November 2 jurisdiction and detention report.

On October 30, the social worker observed that J.M.'s diaper rash had worsened since the prior visit and explained to Shane and Nichole that they needed to attend to the rash immediately. After listening to the reasons why they could not get all the required medication that day, the social worker left, bought the missing medications the doctor had recommended and delivered them (and bus passes) to the parents later that day.

On November 9 when the social worker arrived, J.M. and Shane were sleeping in the same bed, while J.M.'s bassinet (i.e., where J.M. was supposed to sleep) was filled with clothes. The room was cluttered and smelled of sweat, spoiled milk and urine.

The Agency's recommendations did not change from those contained in the Agency's November 2 jurisdiction and disposition report: namely, that custody remain with the parents; that Shane not be allowed unsupervised time with J.M. (with discretion to the Agency to lift the requirement of supervision); that family maintenance services be ordered; and that Shane and Nichole be ordered to undergo a psychological evaluation.

F.    *The Contested Adjudication and Disposition Hearing (Dec. 9)*

The contested adjudication and disposition hearing took place as scheduled on December 9.

The juvenile court proceeded by way of a documents trial at which the court received into evidence (without objection) and considered: the October 9 detention

12

report; the November 2 jurisdiction and disposition report; the November 19 addendum report; and the social worker's curriculum vitae. Following argument by counsel, the court took jurisdiction, sustaining the allegations in the petition and finding that there is a substantial risk that J.M. will suffer serious physical harm or illness as described in section 300, subdivision (b)(1). The court allowed J.M. to remain in the custody of his parents on a number of conditions, including that J.M. not be left alone with Shane.[12]

Shane timely appealed from the juvenile court's December 9 adjudication and disposition order.[13]

## II.

## DISCUSSION[14]

Shane argues first that the record does not contain substantial evidence to support the juvenile court's finding of jurisdiction. Shane further contends that even if substantial evidence supports the jurisdictional finding, the court nonetheless erred in limiting

---

[12] The juvenile court gave the Agency the discretion — with the concurrence of J.M.'s counsel — to authorize short periods of time for Shane to parent unsupervised, so long as these visits are in a public place or there is another adult nearby to assist if needed.

[13] Nichole did not appeal. The parties agree that Nichole's decision to forego an appeal does not affect Shane's standing and the justiciability of the issues Shane raises in his appeal. We also agree and will reach the merits of Shane's arguments. (See *In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

[14] J.M. joins in the Agency's brief on appeal. (Cal. Rules of Court, rule 8.200(a)(5); further undesignated rule references are to the California Rules of Court.)

Shane's contact with J.M. to a supervised setting. As we explain, Shane did not meet his burden of establishing error under either theory.

A.    *Substantial Evidence Supports the Finding of Jurisdiction*

Shane argues that the juvenile court erred in finding jurisdiction and thereby adjudicating J.M. a dependent of the court.

1.    *Standard of Review*

Where, as in this appeal, an appellant challenges the sufficiency of the evidence to support a jurisdictional finding, "the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence and in the inferences to be drawn from evidence are the domain of the trial court, not the reviewing court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 450-451; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773 (*I.J.*).)

The testimony of a single witness or evidence from a single document may be sufficient (Evid. Code, § 411); whereas even uncontradicted evidence in favor of a contrary finding does not establish the fact for which the evidence was submitted (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 890 (*Foreman*)). On appeal, all evidence in support of the finding " 'must be accepted as true and that which is unfavorable discarded as not having sufficient verity to be accepted by the trier of fact.' " (*In re Brittany H.* (1988) 198 Cal.App.3d 533, 549.) We must affirm if the finding is

14

supported by substantial evidence, "even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence." (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 (*Dakota H.*).) The issue is not whether there is evidence in the record to support a finding the appellant wishes had been made, but whether there is evidence that, if believed, would support the finding actually made. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 872-873.)

As the appellant, Shane has the burden of showing "there is *no evidence of a sufficiently substantial nature*" to support the finding of jurisdiction. (*In re R.V.* (2012) 208 Cal.App.4th 837, 843, italics added (*R.V.*) [jurisdiction based on substantial risk of abuse or neglect under § 300, subd. (j)].)

2. *Law*

In establishing jurisdiction under section 300, the Agency was not required to show that J.M. was *actually* abused or neglected before the juvenile court could assume jurisdiction. (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Subdivision (b), which is applicable here, "require[s] only a 'substantial risk' that the child will be abused or neglected." (*I.J.*, at p. 773.)

The legislatively declared purpose of section 300, subdivision (b) is not only "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited," but also "to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm.*" (§ 300.2, italics added.) " 'The court need not wait until a child is

15

seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' "  (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

3. *Analysis*

In taking jurisdiction, the juvenile court found "that there are a constellation of factors, which . . . place [J.M.] at a substantial risk if there is not the intervention of the court and the Agency."  We are satisfied that the evidence of how Shane's mental health condition manifests *coupled with* how Shane deals with these manifestations are substantial evidence that J.M. is at substantial risk of abuse or neglect.[15]

Every day Shane hears evil voices from his past life that tell him to hurt people; and within the weeks prior to the filing of the petition, once Shane responded by yelling at random person in the street, and once Shane " 'shut[] down' " entirely.  Whenever Shane hears the evil voices and cannot control himself, he either hurts himself or leaves his current surroundings.  Shane has rejected the medical professionals' prescribed medications for what has been diagnosed as bipolar disorder, depression, hallucinations, dysplasia and polysubstance dependence (nicotine, alcohol and marijuana).  Instead, he manages his mental health issues by smoking marijuana away from the Village — on a

---

15    The "constellation of factors" recited by the juvenile court also included evidence that J.M. was not living in clean surroundings (open containers of urine and general filth), that J.M. was not receiving prompt medical attention (diaper rash and a diagnosis of scabies), and that J.M. lacked proper care (sleeping in a car seat or in the same bed as Shane).  Because we conclude in the text, *post*, that Shane's voluntary response to his mental health condition is substantial evidence that J.M. was at considerable risk of abuse or neglect, we need not and do not express an opinion as to the substantiality of the evidence in support of the potential effect of the additional factors on the risk of abuse or harm to J.M.

16

regular basis, even when he does not hear the evil voices. The juvenile court was understandably concerned. These facts are substantial evidence that J.M. is at risk of harm on at least two bases: (1) J.M., an infant, would be without adult supervision or care if, for example, Nichole left J.M. with Shane,[16] Shane heard the evil voices and then either exited the room (perhaps to smoke marijuana[17]) or hurt himself; and (2) Shane could injure J.M. if Shane acted on the evil voices that tell him to hurt others.

Shane persuasively argues that a parent's mental illness, standing alone, is not a basis for jurisdiction without a showing of at least a substantial risk of harm to the minor; i.e., such a risk of harm may not be presumed from the mere fact of a parent's mental illness. (See *In re David M.* (2005) 134 Cal.App.4th 822, 830 (*David M.*) ["Whatever mother's and father's mental problems might be, there was no evidence those problems impacted their ability to provide a decent home for [the minor]."].) However, our conclusion here is not based on Shane's mental health disability, but rather on *how he deals with the effects of his disability*. By leaving the room or hurting himself when he hears the evil voices, Shane puts J.M. at "a 'substantial risk' that [he] will be abused or neglected" if Shane hears the voices at a time when he is solely responsible for the care of four-month-old J.M. (*I.J.*, *supra*, 56 Cal.4th at p. 773.) Shane's argument that "the

---

16      Nichole reported that, as a new mother who must care for both J.M. and Shane, she becomes overwhelmed and needs times alone to relieve stress, but will not leave J.M. with anyone other than Shane.

17      Using marijuana is one way Shane self-medicates to avoid acting on the evil voices when he hears them.

17

[juvenile] court's concern primarily appeared to be [Shane's] mental health disability" mischaracterizes the record and is unfair to the court, which thoughtfully considered the evidence and explained its ruling.

Shane also persuasively argues that the risk of harm to the child may not be speculative; i.e., the evidence must support a finding that the risk of harm is present at the time of the hearing. (*David M.*, *supra*, 134 Cal.App.4th at pp. 831-832.) In this regard, Shane emphasizes that there is no evidence that he has ever "acted on the voices his mental illness produced, particularly in any way against [J.M.] or [Nichole]." However, our conclusion here is not based on what Shane might do, but rather on how Shane *currently* responds to the evil voices that he hears on a regular basis — i.e., he leaves the room or hurts himself, and recently he yelled at a random person in the street. Once again, these are responses that result in "a 'substantial risk' that [J.M.] will be abused or neglected" if they occur at a time when Shane is solely responsible for J.M.'s care. (*I.J.*, *supra*, 56 Cal.4th at p. 773.)

In arguing that J.M. was never in "imminent harm," Shane relies on certain evidence from the social worker that J.M. was "a healthy developing child" who "continued to thrive" and "was alert . . . [and] described as well-appearing." The fact that J.M. is healthy and thriving is not determinative. Under section 300, subdivision (b)(1), the Agency was not required to show that J.M. had been abused or neglected, only that there is "a 'substantial risk' that the child *will be* abused or neglected." (*I.J.*, *supra*, 56 Cal.4th at p. 773, italics added.) In any event, in performing our review on appeal, we consider only the substantiality of the evidence that supports the ruling of the juvenile

18

court, not the substantiality of evidence that might support a different finding. (*Dakota H.*, *supra*, 132 Cal.App.4th at p. 228.)

For the foregoing reasons, Shane did not meet his burden of showing "there is no evidence of a sufficiently substantial nature" to support the finding of jurisdiction. (*R.V.*, *supra*, 208 Cal.App.4th at p. 843.)

B.     *The Juvenile Court Did Not Err in Requiring Supervision When Shane Is with J.M.*

Shane argues that, by precluding him from being alone with J.M., the juvenile court violated his substantive due process rights under the Fourteenth Amendment of the United States Constitution. In passing, Shane also mentions that the evidence does not support the disposition.

1.     *Standard of Review*

Shane suggests a de novo standard of review for what he describes as a purely legal issue on undisputed facts — namely, whether the juvenile court may "completely deprive the father of any alone time with his child considering the court did not issue removal orders." (*In re T.G.* (2013) 215 Cal.App.4th 1, 14 [de novo standard of review for alleged 14th Amend. violation].) Citing *Troxel v. Granville* (2000) 530 U.S. 57, 65 (plur. opn. of O'Connor, J.) (*Troxel*) and *Lee v. City of Los Angeles* (9th Cir. 2001) 250 F.3d 668, 685, Shane attempts to elevate the issue to one of constitutional dimension by contending that the juvenile court's order violated his Fourteenth Amendment constitutionally protected liberty interest in the care and control of his child. (*Troxel*, at p. 65 (plur. opn. of O'Connor, J.) [parents have a 14th Amend. liberty interest "in the care, custody, and control of their children"].)

19

The Agency contends that the dispositional portion of the order that limits Shane to supervised time with J.M. is reviewed for an abuse of discretion. According to the Agency, once the juvenile court takes jurisdiction, the " 'court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly. On appeal, this determination cannot be reversed absent a clear abuse of discretion.' . . . ' "The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child." ' " (*In re Natalie A.* (2015) 243 Cal.App.4th 178, 186-187, citation omitted [father ordered to participate in drug counseling and testing].) Application of an incorrect legal standard is an abuse of discretion. (*In re R.T.* (2015) 232 Cal.App.4th 1284, 1301.)

2.      *Analysis*

The two suggested standards of review are not inconsistent in this situation, since a disposition that violates the federal Constitution is necessarily an abuse of the juvenile court's discretion. (See *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977 [exercise of discretion must be " 'guided by legal principles and legal policies appropriate to the particular matter at issue' "]; *In re Shannon M.* (2013) 221 Cal.App.4th 282, 289 ["a court abuses its discretion when it applies incorrect legal standards"].) In any event, the standard of review does not matter, since Shane forfeited appellate review of the disposition in this case.

On appeal Shane argues *for the first time* that, as a matter of law, any order requiring supervision when a father has custody of his child is a violation of the federal

Constitution.[18]  In so doing, Shane violates the general rule that " '[a]ll issues, even those involving an alleged constitutional violation, are subject to the rule of forfeiture, and a [party's] failure to raise the issue before the trial court will generally result in the appellate court's refusal to consider it.' "  (*In re M.H.* (2016) 1 Cal.App.5th 699, 713 [delinquency proceeding].)  "Dependency matters are not exempt from this rule [of forfeiture]."  (*In re S.B.* (2004) 32 Cal.4th 1287, 1293 (*S.B.*) [objection to visitation order].)  "The purpose of this rule is to encourage parties to bring errors to the attention of the trial court . . ." (*ibid.*), because the consideration of such an issue for the first time on appeal "is often unfair to the trial court, unjust to the opposing party, and contrary to judicial economy because it encourages the embedding of reversible error through silence in the trial court" (*In re M.H.*, at p. 714).

Although courts may exercise discretion to consider constitutional challenges for the first time on appeal under certain circumstances (*S.B.*, *supra*, 32 Cal.4th at p. 1293), we decline to do so in this case.  Shane knew at the time of the contested adjudication and disposition hearing that the juvenile court was considering an award of custody to Shane and Nichole that precluded Shane from being alone with J.M.:  The supervision requirement that Shane challenges had already been in place since the detention hearing;

---

18      Although Shane's attorney generally argued to the juvenile court that Shane should not be deprived of time alone with J.M., the totality of counsel's presentation was:  "So we are asking the court to allow [Shane] to have alone time with his son.  I know the current court order is that he may not be left alone with his son.  He would ask that — he [would] like to have some time alone with his son, even for some brief moments, and I think that would help [Nichole] have some brief breaks and not have to be there constantly with their son."

21

and the Agency's November 2 jurisdiction and adjudication report and November 19 addendum both recommended that the condition remain in place as part of the disposition. In this regard, *In re Dakota S.* (2000) 85 Cal.App.4th 494 is instructive: "[I]t would be inappropriate to allow a party not to object to an error of which the party is or should be aware, ' "thereby permitting the proceedings to go to a conclusion which he may acquiesce in, if favorable, and which he may avoid, if not." ' " (*Id.* at p. 501.)

As an additional basis of forfeiture, Shane's presentation does not comply with rule 8.204(a)(1)(B)'s requirement that each point in a brief be supported "by argument and, if possible, by citation of authority." The *entirety* of Shane's contention reads as follows: "Without a removal order, the court did not determine [Shane] unfit and so it was error to deprive [Shane] of any time alone with his child." The *only* authority Shane cites is to six consecutive pages of the plurality opinion in *Troxel*, *supra*, 530 U.S. at pages 65-70, preceded by the statements that "[*c*]*ustodial* parents have a U.S. Constitution, 14th Amendment substantive due process 'fundamental right' and 'liberty interest' to make decisions concerning the care, custody and control of their children" and that a "[c]ourt[] must give parents deference, it must give their decisions special weight, and it must also give their decisions *presumptive validity*." Shane's failure to present authorities and a legal analysis is particularly prejudicial here, where Shane asks us to find a constitutional violation.

Even if we were to consider Shane's argument on its merits, the result would be no different under *Troxel*, because *Troxel* is inapplicable to the present case. *Troxel*, *supra*, 530 U.S. 57, deals with a Washington State statute regarding *nonparental* child visitation;

22

it is an appeal from a family court order allowing the parents of a deceased father (grandparents) to have visitation of the father's children (grandchildren) over the objection of the mother. (*Id.* at p. 60 (plur. opn. of O'Connor, J.).) *Troxel* does not mention or have anything to do with dependency proceedings in which a minor has been declared a dependent of the juvenile court as a result of potential harm to the minor and thus within the court's jurisdiction.[19] Furthermore, the premise for Shane's argument ("Without a removal order, the court did not determine [Shane] unfit . . .") is neither supported by the record nor compels the conclusion Shane proffers ("it was error to deprive [Shane] of any time alone with [J.M.]"). Although the juvenile court here did not expressly find Shane to be an unfit parent, the court did find — and substantial evidence supports the finding (see pt. II.A.3., *ante*) — that Shane's behavior (*not his mental disability*) is a direct cause of the substantial risk of serious harm to J.M. Also, Shane provides no authority (and our independent research has not disclosed authority) that

---

[19]   In *Troxel*, there was no evidence (or argument) that the children were either harmed or at risk of harm. Although the plurality opinion expressly declined to decide whether the due process clause requires all nonparental visitation statutes to include a showing of harm or potential harm to the child before allowing visitation (*Troxel*, *supra*, 530 U.S. at p. 73 (plur. opn. of O'Connor, J.)), the opinion summarized without criticism the Washington Supreme Court's ruling that the federal constitution may interfere with parents' fundamental right to raise their children "only to prevent harm *or potential harm* to a child." (*Id.* at p. 63 (plur. opn. of O'Connor, J.), citing *In re Custody of Smith* (Wash. 1998) 137 Wash.2d 1, 15-20, affd. *sub nom. Troxel*, *supra*, 530 U.S. 57.) In the present appeal, by finding jurisdiction under section 300, subdivision (b), the juvenile court necessarily found at least potential harm to J.M. (*I.J.*, *supra*, 56 Cal.4th at p. 773 [§ 300, subd. (b) "require[s] only a 'substantial risk' that the child will be abused or neglected"].) Thus, because Shane's behavior resulted in potential harm to J.M., Shane's reliance on *Troxel* is misplaced.

requires a removal order before a juvenile court may require a parent's time with a minor to be supervised after a finding of jurisdiction.

Finally, to the extent Shane argues that there is no substantial evidence to support the disposition, he also forfeited appellate review of this argument. The *entirety* of Shane's presentation in this regard is: "The evidence did not support the court's order for absolutely no alone time between [Shane] and [J.M.]." By failing to set forth in his opening brief all the material evidence on the issue and argue why it is not substantial, Shane forfeited appellate review of any substantial evidence argument. (*Foreman*, *supra*, 3 Cal.3d at p. 881 [Appellants who argue a lack of substantial evidence are required " 'to demonstrate that there is *no* substantial evidence to support the challenged finding[]' " and " 'to set forth in their brief *all* the material evidence on the point . . . . Unless this is done the error assigned is deemed waived.' "]; *In re S.C.* (2006) 138 Cal.App.4th 396, 414-415 [same].)

In any event, the substantial evidence in support of the juvenile court's finding of jurisdiction discussed at part II.A.3., *ante*, fully substantiates the requirement that Shane be supervised when he is with J.M.

For the foregoing reasons, Shane did not meet his burden of showing that the juvenile court erred in precluding Shane from being alone with J.M.

DISPOSITION

The December 9, 2015 adjudication and disposition order is affirmed.


IRION, J.

WE CONCUR:


HUFFMAN, Acting P. J.


PRAGER, J.*

---

\*      Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.